Christy BRZONKALA, Plaintiff,

v.

VIRGINIA POLYTECHNIC AND STATE UNIVERSITY, et al., Defendants.

Civil Action No. 95–1358–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

July 26, 1996.

Eileen Marie Nause Wagner, Richmond, VA, for Christy Brzonkala.

Julie C. Dudley, U.S. Attorney's Office, Robert P. Crouch, Jr., United States Attorney, Roanoke, VA, Frank W. Hunger, John R. Tyler, Dennis G. Linder, Department of Justice, Civil Division, Washington, DC, for United States.

Kay Kurtz Heidbreder, Virginia Polytechnic Institute & State University, Blacksburg, VA, for Virginia Polytechnic and State University.

William David Paxton, M. Chris Floyd, Gentry, Locke, Rakes & Moore, Roanoke, VA, Michael E. Rosman, Center for Individual Rights, Washington, DC, for Antonio J. Morrison.

Joseph Graham Painter, Jr., Blacksburg, VA, for James Landale Crawford.

Sharon R. Chickering, DLC Trial Lawyers, P.C., Roanoke, VA, Julie Goldscheid, Pamela Coukos, Deborah Ellis, Now Legal Defense and Education Fund, New York City, Minna Kotkin, BLS Legal Services Corp., Brooklyn, NY, for Now Legal Defense and Education Fund.

Jane Siobhan Glenn, Jones & Glenn, P.L.C., Roanoke, VA, for Cornell D. Brown.

Kay Kurtz Heidbreder, Virginia Polytechnic Institute & State University, Blacksburg, VA, for William E. Landsidle.

## MEMORANDUM OPINION

KISER, Chief Judge.

On March 1, 1996, Christy Brzonkala filed an amended complaint alleging violations of Title IX of the Education Amendment Act, 20 U.S.C. § 1681, *et seq.*, of Title III of the Violence Against Women Act, 42 U.S.C. § 13981 ("VAWA"), and of various state laws. Brzonkala brought claims against Virginia Polytechnic Institute & State University ("VPI"), William Landsidle in his capacity as Comptroller of the Commonwealth, and three VPI football players, Antonio Morrison, James Crawford, and Cornell Brown.

I dismissed the claims against VPI, William Landsidle, and Cornell Brown, and now I will consider the claims against Morrison and Crawford. Only the VAWA and some state law claims remain.

### I. Alleged Facts

Brzonkala is an adult female who resides in Fairfax, Virginia. She attended VPI where she was a "student athlete" and a prospect for the women's softball team. Morrison and Crawford are adult males. They attend VPI where they are members of the all-male football team. On the night of September 21, 1994 and the morning of the next day, Brzonkala was sexually assaulted in a room on the third floor of her dormitory

by two men whom she and Hope Handley, another female student, had met less than a half-hour earlier and whose identities she knew only by given names and by their status as football team members. Brzonkala alleges that the two men forced her to have sexual intercourse by threat and intimidation and through the use of Brzonkala's "mental incapacity and physical helplessness." She alleges that the two men's acts "were motivated wholly by discriminatory animus toward her gender and were not random acts of violence." Brzonkala reported that she was not inebriated at the time of the assaults. About five months later, Brzonkala learned that the assailants were Morrison and Crawford.

On September 21, Brzonkala, Handley, Morrison, and Crawford were in a room on the third floor of Brzonkala's dormitory. Handley and Crawford left the room following fifteen minutes of conversation, and Morrison immediately requested intercourse with Brzonkala. Brzonkala audibly told Morrison "no" twice. When Brzonkala rose to leave, Morrison forced her face-up onto a bed, pushed her down by her shoulders, and disrobed her. Morrison pinned her down by her elbows with his hands, pressed his knees against her legs, and forced her to submit to vaginal intercourse. Brzonkala attempted to push Morrison off. Then, before Brzonkala could recover, Crawford came back into the room, exchanged places with Morrison, and forced Brzonkala to submit to vaginal intercourse by pinning down her arms and placing his knees against her legs. Again before Brzonkala could recover, Morrison exchanged places with Crawford and forced Brzonkala to submit to vaginal intercourse a third time. Afterwards, Morrison said to Brzonkala, "You better not have any fucking diseases." Neither Morrison nor Crawford used a condom.

In February 1995, Brzonkala recognized Morrison and Crawford as the two men who forced her to submit to intercourse. Prior to this identification, Morrison announced publicly in the dormitory's dining hall and in the presence of VPI student Charlotte Wachter, "I like to get girls drunk and fuck the shit out of them." At the end of April 1995,

Brzonkala filed a complaint against Morrison and Crawford under VPI's Sexual Assault Policy. After Brzonkala filed her complaint, she learned that a VPI student overheard an unidentified male VPI athlete advise Crawford that he should have "killed the bitch."

In the first hearing, Morrison admitted the sexual contact and admitted that Brzonkala told him "no" twice. Crawford confirmed that Morrison had sexual conduct with Brzonkala and testified that Brzonkala was "really drunk" when she arrived in the room. Crawford denied that he had sexual contact with Brzonkala. The VPI judicial committee found Morrison guilty of sexual assault and suspended him from school for two semesters. The committee found insufficient evidence to take action against Crawford. In May 1995, Morrison appealed the committee's sanction, and an appeals officer upheld the sanction.

During a second hearing, the judicial committee found Morrison guilty of abusive conduct and reimposed the sanction of an immediate two-year suspension. Morrison appealed the result, and, without notice to Brzonkala, VPI set aside the sanction against Morrison. Morrison returned to VPI for the Fall 1995 semester. Brzonkala learned through a November 30, 1995 newspaper article that the judicial committee at the second hearing had actually found Morrison guilty of a reduced charge of "using abusive language." Because Morrison would be present on the VPI campus during the Fall 1995 semester, Brzonkala feared for her personal safety and canceled her plan to return to VPI for the Fall semester.

## II. Statute

### 42 U.S.C. § 13981. Civil Rights

#### (a) Purpose

Pursuant to the affirmative power of Congress to enact this part under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of the Constitution, it is the purpose of this part to protect the civil rights of victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce by establishing a Federal civil rights cause of

action for victims of crimes of violence motivated by gender.

**(b) Right to be free from crimes of violence**

All persons within the United States shall have the right to be free from crimes of violence motivated by gender (as defined in subsection (d) of this section).

**(c) Cause of action**

All persons (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

**(d) Definitions**

For purposes of this section——

(1) the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender; and

(2) the term "crime of violence" means——

(A) an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States; and

(B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken.

**(e) Limitation and procedures**

**(1) Limitation**

Nothing in this section entitles a person to a cause of action under subsection (c) of this section for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender (within the meaning of subsection (d) of this section).

**(2) No prior criminal action**

Nothing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c) of this section.

**(3) Concurrent jurisdiction**

The Federal and State courts shall have concurrent jurisdiction over actions brought pursuant to this part.

**(4) Supplemental jurisdiction**

Neither section 1367 of Title 28 nor subsection (c) of this section shall be construed, by reason of a claim arising under such subsection, to confer on the courts of the United States jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree.

### III. Issues

Two issues are involved: (1) whether the complaint sufficiently states a claim by Fed. R.Civ.P. 12(b)(6) standards, and, if so, (2) whether VAWA is constitutional.

### IV. Whether Brzonkala States a Claim

**A. Standard**

Rule 12(b)(6) dismissals are generally disfavored and only granted when it appears beyond doubt that a plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). I may only test plaintiff's complaint for any legal deficiency and must construe the factual allegations in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.1991), *cert. denied,* 503

U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992).

## B. Analysis

The sticking point in determining if Brzonkala sufficiently stated a VAWA claim is whether she has sufficiently alleged that the rape was "motivated by gender." A crime "motivated by gender" is defined as a crime "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *See* 42 U.S.C. § 13981(d)(1).

Defendants argue that Brzonkala failed the liberal pleading standards of Fed.R.Civ.P. 8. "A pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief,...." Fed.R.Civ.P. 8(a). "Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required." Fed. R.Civ.P. 8(e)(1).

The legislative history behind VAWA sheds some light on the proof requirements which, in turn, shed some light on the pleading requirements. "Proof of 'gender-motivation' under [T]itle III should proceed in the same ways proof of race or sex discrimination proceeds under other civil rights laws. Judges and juries will determine 'motivation' from the 'totality of the circumstances' surrounding the event." S.Rep. No. 197, 102d Cong., 2d Sess. 50 (1991). "Bias, in short, can be proved by circumstantial as well as indirect evidence." S.Rep. No. 138, 103d Cong., 1st Sess. 52 (1993).

> Generally accepted guidelines for identifying hate crimes may also be useful in assessing whether the circumstances show gender-motivation. The following characteristics are used to determine whether a crime is bias related: language used by the perpetrator; the severity of the attack (including mutilation); the lack of provocation; previous history of similar incidents; absence of any other apparent motive (battery without robbery, for example); common sense....

S.Rep. No. 197, 102d Cong., 2d Sess. 50 n. 72. The statute in question "requires subjective proof on a case-by-case basis that the crimi-

nal was motivated by a bias against the victim's gender. Whether a particular crime is, in fact, gender-motivated will be a question of fact for the court or jury to decide...." S.Rep. No. 138, 103d Cong., 1st Sess. 49–50.

In support of her VAWA claim, Brzonkala makes the conclusory statement that Morrison and Crawford's actions "were motivated wholly by discriminatory animus toward her gender and were not random acts of violence." Such a conclusory statement is likely insufficient to state a claim. *Cf. Simpson v. Welch,* 900 F.2d 33 (4th Cir. 1990). However, Brzonkala has alleged other facts that support this conclusory statement.

Brzonkala alleges that she had met Morrison and Crawford less than a half-hour before she was raped, that Morrison and Crawford participated in a gang rape of Brzonkala, Morrison having sex with her one time before and one time after Crawford had sex with her, that neither Morrison nor Crawford used a condom, that, after raping her the second time, Morrison stated to Brzonkala, "You better not have any fucking diseases," and finally that, within about five months after the rapes, Morrison announced publicly in the dormitory's dining hall and in the presence of at least one woman, "I like to get girls drunk and fuck the shit out of them."

I need not decide whether the allegation of the rapes alone is sufficient to state a claim. All rapes are not the same, and the characteristics of the rapes here alleged, when compared to other rapes, indicate that gender animus more likely played a part in these rapes than in some other types of rape. First, the assault involved a gang rape. While any rape is egregious, all other factors the same, gang rape generally is more egregious than one-on-one rape. Where, as here, two men rape one woman, this indicates a conspiracy of disrespect for that woman. Second, these rapes fall somewhere in between stranger rape and date rape, and are probably closer to stranger rape. Again, while any rape is egregious, stranger rape and rapes such as the one in question gener-

ally are more egregious than date rape. Additionally, stranger rape generally more likely than date rape involves gender animus. For example, date rape could involve a misunderstanding and is often less violent than stranger rape. By the facts alleged, the case at hand does not involve any misunderstanding. Date rape could also involve a situation where a man's sexual passion provokes the rape by decreasing the man's control. Here there is no indication that sexual passion caused Morrison to initiate intercourse. Finally, date rape could involve in part disrespect for the victim as a person, not as a woman; in date rape the perpetrator knows the victim's personality to some extent. In the case at hand, the facts indicate that Morrison and Crawford had little if any knowledge of Brzonkala's personality. Therefore, by process of elimination, an inference of gender animus is more reasonable in this situation than in some other rapes.

In Morrison's case, two facts other than the characteristics of the rapes point to gender animus. After having intercourse with Brzonkala for the second time, Morrison stated, "You better not have any fucking diseases." While the relevance of this to gender animus is questionable, this further evidences the disrespect that Morrison had for Brzonkala, irrespective of any knowledge of her personality. More importantly and more relevant to gender animus, Morrison stated at a later date, in the presence of at least one woman, "I like to get girls drunk and fuck the shit out of them." Although Morrison did not state that he likes to rape women, his statement reflects that he has a history of taking pleasure from having intercourse with women without their sober consent. This statement indicates disrespect for women in general and connects this gender disrespect to sexual intercourse, and, at least, raises an issue to be pursued in discovery. Although the statement is relevant without such an inference, the reasonable inference that Brzonkala was intoxicated at the time of the rapes further links Morrison's statement to the alleged rapes at issue. While Brzonkala alleges that she "reported that she was not inebriated at the time of the assaults," she also alleges that Morrison raped her "through the use of [her] mental incapacity."

Crawford stated that Brzonkala was "really drunk."

Congress obviously intended this statute to apply to rapes motivated by gender bias. Morrison's actions outwardly evidence gender animus more than many, if not most, situations of rape (at least before discovery has revealed any other evidence of gender animus). The purpose of the statute would be eviscerated if, to state a claim, a plaintiff had to allege, for example, that the defendant raped her and stated, "I hate women." Defendants indicate that plaintiffs must allege facts such as an ongoing series of sexual assaults by the defendant. But, as plaintiff points out, she has not had opportunity to take discovery to uncover any possible prior similar assaults. Additionally, I question whether the alleged sexual assault plus a statement indicating that Morrison enjoys having intercourse with women against their sober consent is any less indicative of gender animus than an allegation of a series of sexual assaults.

Therefore, at least against Morrison, Brzonkala has successfully stated a claim for a violation of 42 U.S.C. § 13981. The characteristics of the rape combined with Morrison's statements are sufficient at least to meet the minimal federal pleading requirements. Whether Brzonkala can prove the allegations in her complaint by a preponderance of the evidence is not currently an issue before the Court. Deciding whether a claim is stated against Crawford is unnecessary considering my decision on the constitutionality of VAWA.

### V. Whether VAWA (42 U.S.C. § 13981) Is Constitutional

If VAWA is constitutional, it must be based either on the Commerce Clause or the Enforcement Clause of the Fourteenth Amendment.

### A. Commerce Clause

#### 1. Commerce Power Generally

Article I of the U.S. Constitution authorizes Congress "[t]o regulate commerce ... among the several States...." U.S. Const.,

art. I, § 8, cl. 3. Plaintiff[1] argues that VAWA is constitutional because it addresses conduct that substantially affects interstate commerce. In *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court considered the constitutionality of former 18 U.S.C. § 922(q), the Gun–Free Zone Act of 1990, which forbade " 'any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone.' " *Id.* at ——, 115 S.Ct. at 1626 (quoting former 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V)). Specifically, the Court considered whether this act was a permissible use of Congress's commerce power.

In answering this issue, the Court considered important that "the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.' " *Id.* at —— ——, 115 S.Ct. at 1628–1629 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)). The Court has "heeded that warning" and has "undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." *Id.* at ——, 115 S.Ct. at 1629 (citing among other cases *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276–280, 101 S.Ct. 2352, 2360–2362, 69 L.Ed.2d 1 (1981)). The Supreme Court has not " 'declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities.' " *Id.* (quoting *Maryland v. Wirtz*, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)). "Rather, '[t]he Court has said only that where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.' "

*Id.* (quoting *Wirtz*, 392 U.S. at 197 n. 27, 88 S.Ct. at 2024 n. 27).

■ Under its commerce power, Congress may regulate three broad categories of activity. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Third, Congress may regulate those activities having a substantial relation to interstate commerce. *Id.* at —— – ——, 115 S.Ct. at 1629–1630 (citations omitted). In *Lopez*, the Court concluded that, in order to qualify for the third category, the regulated activity must "substantially affect" interstate commerce. *Id.* at ——, 115 S.Ct. at 1630.

## 2. First Two Categories

■ As in *Lopez*, in the case at hand the first two categories can be easily eliminated. VAWA is not "a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce." *Cf. Lopez*, —— U.S. at ——, 115 S.Ct. at 1630. Also, VAWA is not a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce. *Cf. id.* Admittedly women often travel between states, as do their abusers and assailants, but certainly more is required to qualify for the commerce power. Therefore, if VAWA is a permissible exercise of power under the Commerce Clause, it must qualify for the third category: it must regulate an activity that has a substantial effect on interstate commerce.

## 3. *Lopez's* Analysis of Substantial Effect on Interstate Commerce

The effects-analysis of the majority decision in *Lopez* can be broken down into four parts. First, the Court noted the relevance of the nature of the regulated activity; the Court distinguished that case,

---

**1.** From this point on, "plaintiff" may refer to Brzonkala's initial counsel, the Government, which intervened on Brzonkala's behalf, *amici,* or some or all of the above.

dealing with the regulation of intrastate possession of guns, from cases dealing with the regulation of an intrastate activity which is economic in nature. Second, the Court considered whether § 922(q) had any jurisdictional element to ensure in individual cases that the firearm possession would affect interstate commerce. Third, the Court considered the importance of legislative history. And finally the Court considered the practical implications of accepting the Government's argument that the economic impact of the regulated activity had sufficient effects on interstate commerce to sustain the regulation.

### a. Nature of Regulated Activity

In *Lopez,* the Court noted that *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), was perhaps the most far-reaching example of Commerce Clause authority over intrastate activity and that *Wickard* involved economic activity in a way that the possession of a gun in a school zone does not. *Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1630–1631. In *Wickard,* Roscoe Filburn operated a small farm in Ohio, on which he raised 23 acres of wheat for the year involved. He would sow winter wheat in the fall, harvest it in July, then sell some of it, feed some of it to his farm animals, and keep the remainder for seeding future crops. *Wickard,* 317 U.S. at 114, 63 S.Ct. at 84. The Secretary of Agriculture assessed a penalty against Filburn under the Agricultural Adjustment Act of 1938, because Filburn had harvested about 12 more acres of wheat than the Act permitted. *Id.* at 114–115, 63 S.Ct. at 84. The Court sustained the application of the Act to this activity, stating that home-grown wheat "competes with wheat in commerce," because "it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market." *Id.* at 128, 63 S.Ct. at 91.

The *Lopez* Court differentiated § 922(q) from the statute in *Wickard,* because

[s]ection 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Lopez,* —— U.S. at ——–——, 115 S.Ct. at 1630–1631 (footnote omitted). In effect, the Court separated the Commerce Clause analysis between situations where regulated intrastate activity is economic in nature and situations where the intrastate activity is not. After *Lopez,* cases such as *Wickard,* where regulated intrastate activity is economic in nature, do not control cases where regulated intrastate activity is not economic. At the least, after *Lopez,* whether intrastate activity is economic in nature is a very relevant consideration.

### b. Individual Case Inquiry

In the next step in *Lopez,* the Court considered important that § 922(q) did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at ——, 115 S.Ct. at 1631. Section 922(q) had no jurisdictional element which limited "its reach to a discrete set of firearm possessions" that had "an explicit connection with or effect on interstate commerce." *Id.*

### c. Relevance of Legislative History

The Court noted that the Government conceded that no express congressional findings were presented regarding the effects upon interstate commerce of gun possession in a school zone and that "to the extent that congressional findings would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here." *Id.* at ——–——, 115 S.Ct. at 1631–1632. The Court, however, also stated that such findings were not necessary. *Id.* at ——, 115 S.Ct. at 1631 (citations omitted). The Court further noted that Congress had made findings under an amended § 922(q). *Id.* at ——

n. 4, 115 S.Ct. at 1632 n. 4. At oral argument, the Government stated regarding the congressional findings, "[W]e're not relying on them in the strict sense of the word, but we think that at a very minimum they indicate that reasons can be identified for why Congress wanted to regulate this particular activity." *Id.* From this statement, the Court surmised that "[t]he Government [did] not rely upon these subsequent findings as a substitute for the absence of findings in the first instance." *Id.*

### d. Practical Implications

The Court addressed the practical implications of accepting as sufficient the Government's argued effects on commerce. *Id.* at ———————, 115 S.Ct. at 1632–1634. The Government argued that

> possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being. As a result, the Government argues that Congress could rationally have concluded that § 922(q) substantially affects interstate commerce.

*Id.* at ———, 115 S.Ct. at 1632.

The Court observed that, if the regulation was constitutional based on these effects, then Congress's power would be extended too far. Under the Government's "costs of crime" reasoning, Congress could regulate "not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* The Court stated that, under the Government's "national productivity" reasoning, Congress could regulate "any activity that [Congress] found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example." *Id.* The Court concluded, "Thus, if we were to accept the Government's arguments, we are hard-pressed to posit any activity by an individual that Congress is without power to regulate." *Id.* Under the "threat to learning" reasoning, Congress could directly regulate family law issues and education. *Id.* at ———————, 115 S.Ct. at 1632–1633.

### 4. Application of *Lopez*'s Substantial Effects Analysis to the Case at Hand

 Congressional findings in support of VAWA reveal that violence against women is prevalent, and the Senate Report states that

> [g]ender-based violent crimes meet the modest threshold required by the Commerce Clause. Gender-based crimes and fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy. Gender-based violence bars its most likely targets—women—from full participation in the national economy. For example, studies report that almost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime. Even the fear of gender-based violence affects the economy because it deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence.

S.Rep. 138, 103d Cong., 1st Sess. 54 (1993). Notably, the *Lopez* Court stated, " '[S]imply because Congress may conclude that a particular activity affects interstate commerce does not necessarily make it so.' " *Lopez*, —— U.S. at —— n. 2, 115 S.Ct. at 1629 n. 2 (quoting *Hodel v. Virginia Surface Mining and Reclamation Assn., Inc.*, 452 U.S. 264, 311, 101 S.Ct. 2389, 2391, 69 L.Ed.2d 1 (1981) (Rhenquist, J., concurring)). " 'Whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative

question, and can be settled finally only by this Court.'" *Id.* (quoting *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258 (1964)). This is particularly true where, subsequent to the Senate's above finding, the "modest threshold required by the Commerce Clause" has become less modest. The House Conference found:

> [C]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce; crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

H.R.Rep. No. 711, 103d Cong., 2d Sess. 385 (1994) U.S.Code Cong. & Admin.News 1801, 1853.

The differences between *Lopez* and the case at hand are insignificant, and the similarities are significant. Arguably the following three differences between the case at hand and *Lopez* render *Lopez*'s logic inapplicable to the case at hand: (1) that VAWA is civil, and the *Lopez* statute was criminal, (2) that there are legislative findings here but not in *Lopez,* and (3) that fewer steps of causation exist between the VAWA regulated activity and commerce than § 922(q)'s regulated activity and commerce. The similarities include (1) the criminal nature of both statutes, (2) the non-commercial nature of both statutes, (3) the lack of a jurisdictional requirement that some effect on interstate commerce is involved in each case, (4) the remoteness of any effect on commerce, and (5) the excessive congressional power that would logically follow from permitting both statutes based on the Commerce Clause.

### a. Possible Differences

█ A close look at the possible differences reveals that they are insignificant and that the possible differences often point to similarities instead of differences. First, whereas no congressional findings were be-fore the *Lopez* Court connecting the relevant activity to interstate commerce, congressional findings which support that violence against women affects interstate commerce are currently before this Court. As the *Lopez* Court pointed out, however, such findings are not necessary. *Id.* at ——, 115 S.Ct. at 1631 (citations omitted). The Court only found the missing findings relevant in that the findings would have enabled the Court "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye...." *Id.* at ——, 115 S.Ct. at 1632. Having said that, the Court noted that the amended § 922(q) included congressional findings regarding the effects upon interstate and foreign commerce of firearm possession in and around schools. *Id.* at —— n. 4, 115 S.Ct. at 1632 n. 4. If the Court felt that such findings were extremely important, i.e. that the Court did not have a sufficient awareness of the effects absent the findings, then the Court could have considered the added congressional findings even in the face of the Government's statement that it was not relying on the added findings "in the strict sense of the word," but that "at a very minimum [the findings] indicate that reasons can be identified for why Congress wanted to regulate this particular activity." *Id.* The fact that an attorney made an ambiguous statement possibly indicating a minimal reliance on congressional findings does not preclude a court from considering these findings.

█ Regardless, even absent the express congressional findings, the *Lopez* Court had a sufficient knowledge of interstate commercial effects to consider. The commerce power is based on a reasonable effect on interstate commerce, not on Congress's perceived effect on commerce. While the effects on commerce in *Lopez* were not obvious because they were so tenuous, undoubtedly the Court could fairly easily infer the effects in order to make a reasonable determination whether these effects were substantially related to commerce. Also, as listed in the appendix to *Lopez,* the Court had much authority to consider regarding the issue. *See id.* at —— —— ——, 115 S.Ct. at 1665–1671. More impor-

tantly, the Government actually presented the commercial effects in its argument, and the Court considered whether these sufficed.

In sum, the fact that the effects need not be inferred in the case at hand is not a very important difference. Congress need not make findings, the *Lopez* Court had access to Congress's added findings, the *Lopez* Court had a reasonable appreciation of the effects *via* reasonable inferences, the authority in the appendix, and the Government's argument, and the *Lopez* Court thoroughly considered the effects presented. The fact that Congress's findings were not stressed in the Government's argument is somewhat incidental, and it appears that the Court mentioned this simply as one feather with which to fill an already full pillow. While findings will often be helpful, findings are not necessary for a determination of whether a rational relation to interstate commerce exists.

Second, the statute at issue is civil, whereas *Lopez* involved a criminal statute. This is technically a correct statement, however, VAWA is criminal in nature. VAWA was designed to address problems in the state criminal justice system, and, in attempting to supplement deficiencies in the state criminal system, it creates a civil cause of action that seeks to vindicate a criminal act. It provides a civil remedy for a "crime of violence," which is defined in part as "an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another." 42 U.S.C. § 13981(d)(2)(A). A person liable under the act "shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate." 42 U.S.C. § 13981(c). Regardless, whether a statute based on the Commerce Clause is civil or criminal is of limited relevance. With statutes regulating intrastate activities, the primary concern is whether the activity is economic. Other than the economic nature of the activity to be regulated, the focus is not on the nature of the activity but on the related issue of the effects of the regulated activity on interstate commerce.

Third, the steps of causation in the instant case are fewer than in *Lopez*. At best, an analysis of the steps of causation is an inexact science; the number of steps depends on how each step is defined, and a greater number of steps does not always indicate greater remoteness. Certainly this should not be the method for resolving Commerce Clause issues. In *Lopez*, the Government argued and the Court considered two general chains of causation. First, the possession of a firearm in a school zone may result in violent crime which may affect the national economy through either increased nationwide costs or a reduction in the willingness of individuals to travel to areas within the country that are perceived to be unsafe. Second, guns pose a substantial threat to the educational process by threatening the learning environment, and a handicapped educational environment leads to a less productive citizenry which affects the national economy.

While the problems inherent in a step of causation analysis are compounded when comparing two different laws, comparing the steps in the case at hand to *Lopez* is helpful. Compared with *Lopez*'s first chain of causation, the case at hand possibly involves one less step than the postulated effects in *Lopez*. In the case at hand, the regulated activity is the violent crime, whereas in *Lopez* the regulated activity was an act that could lead to a violent crime. This distinction is not enough to apply the commerce power in the case at hand. The step from possession of a firearm in schools to the commission of a violent crime is a small step. Undoubtedly, often possession of a firearm leads to violent crime. Also, no violent crime is necessary to create an effect on commerce; the fear created solely by the possession of the guns undoubtedly somewhat affects commerce. Finally, the individual steps that each case has in common may be longer in the case at hand than in *Lopez*.

*Lopez*'s second chain of causation is similar to plaintiff's argument that violent crimes against women affect the productivity of the nation by distracting women and by removing women from the workplace. Similarly, guns at schools affect the productivity of the nation by threatening the learning environ-

ment. It is a fair inference that guns at schools are distracting and dissuade many students from attending schools. This chain also involves one less step. Guns affect learning, an effect which in turn affects job performance, which in turn affects the national economy, which in turn affects interstate commerce. In the case at hand, violence against women affects job performance, which in turn affects the national economy, which in turn affects interstate commerce. Again the one less step in the case at hand is unimportant. It is far from clear that the distance from the first to the last step is greater in the *Lopez* chain of causation than in the case at hand's chain.

The bottom line is that both *Lopez* and the case at hand involve regulated activity that is too remote from interstate commerce. Any substantial distinction between the lengths of the chains of causation in *Lopez* and the lengths of the chains in the case at hand is inconsequential. As mentioned, the steps of causation analysis is an inexact science, a formalistic framework upon which no heavy reliance should be placed. In the end, the important issue is the proximity of the regulated activity to commerce, not the number of steps. The proximity between the regulated activity and commerce in the case at hand is similar to the proximity in *Lopez*, and any distinction between the two is based on insignificant differences and on differences which are impossible to comprehend with reasonable certainty. Even accepting the step analysis as helpful and accepting that the case at hand involves fewer steps than the situation in *Lopez*, both situations involve regulated activity which is too remote from interstate commerce.

b. Similarities (Other Than Those in the Possible Differences Section)

Unlike the differences, the similarities between *Lopez* and the case at hand are real and significant. First, of major importance is that VAWA involves intrastate activity which is not commercial or even economic in nature. Any interstate nature of VAWA

is insignificant. VAWA regulates local criminal activity. It does not regulate the growth of crops, the shipment of goods, or other similar economic activities. In line with *Lopez*, whether a statute regulates intrastate activity which is economic in nature is a consideration. *See Lopez,* —— U.S. at —— ——, 115 S.Ct. at 1630–1631. In *Jane Doe v. John Doe,* 929 F.Supp. 608 (D.Conn.1996), the only other opinion I am aware of that addresses this issue to date, the court upheld the constitutionality of VAWA under the Commerce Clause. The court compared the situation in *Wickard* to VAWA. As mentioned, the *Wickard* Court upheld the application of the Agricultural Adjustment Act to home-consumed wheat, stating, "It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions." *Wickard,* 317 U.S. at 128, 63 S.Ct. at 91. Analyzing VAWA in light of *Wickard,* the *Doe* court concluded:

> Certainly the repetitive nationwide impact of women withholding, withdrawing or limiting their participation in the workplace or marketplace in response to or as a result of gender-based violence or the threat thereof, is of such a nature to be as substantial an impact on interstate commerce as the effect of excess "home grown" wheat harvesting which was found to have been properly regulated by Congressional enactment.

*Doe,* 929 F.Supp. at 614 (citation omitted). This analysis is contrary to *Lopez,* which, as discussed, distinguished the *Wickard* case, in which the regulated activity was economic in nature, from cases such as the case at hand and *Lopez,* in which the regulated activity is in no way economic in nature. *Lopez* teaches that cases in which the statute at issue regulates intrastate activity which is economic in nature are analyzed differently from cases involving non-economic intrastate activity. After *Lopez,* reliance on *Wickard* to analyze the commerce power in a case involving a non-economic intrastate activity is not tenable.[2] In addition to *Wickard,* the other cases

---

2. The *Doe* court also based its holding partly on the conclusion that *Lopez*'s practical implications analysis was *dicta. See Doe,* 929 F.Supp. at

613. Counsel for defendants disagree, as do I. However, if this analysis was in fact *dicta,* this would not help the position of the *Doe* court. If

upon which plaintiff relies heavily are all distinguishable as cases involving economic activity. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1630 (listing the following as cases involving congressional acts regulating intrastate economic activity: *Hodel,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (involving intrastate coal mining); *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (involving intrastate extortionate credit transactions); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (involving restaurants utilizing substantial interstate supplies); and *Heart of Atlanta Motel,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (involving inns and hotels catering to interstate guests)).

Second, similar to § 922(q), VAWA does not have a jurisdictional requirement limiting each individual case under VAWA to situations involving interstate commerce. Although it is unclear whether such a jurisdictional requirement is needed, indications exist that such a requirement may be necessary. Congress has often placed such a requirement in legislation similar to VAWA. *See Cleveland v. United States,* 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946) (discussing the Mann Act, which made an offense the transportation in interstate commerce of any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose). In *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), respondent had been convicted for possession of firearms under Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, which mandated punishment for any convict "who receives, possesses, or transports in commerce or affecting commerce . . . any firearm." *Id.* at 337, 92 S.Ct. at 517. There was no attempt to show that respondent had possessed the firearms "in commerce or affecting commerce," and the prosecution had proceeded on the assumption that such connection to commerce was necessary only for the trans-

port element of the statute, not for possession. *Id.* at 338, 92 S.Ct. at 517–518. The Court of Appeals reversed respondent's conviction, finding that if it accepted the prosecution's interpretation of the statute, then there would be substantial doubt as to the statute's constitutionality. *Id.* (citation omitted). The Supreme Court affirmed, but for different reasons, applying the interstate commerce requirement to receiving, possessing, or transporting a firearm. The Court reasoned that ambiguity in criminal statutes should be resolved in favor of lenity, *Id.* at 347, 92 S.Ct. at 522, and that ambiguity should be resolved in favor of not significantly changing the federal-state balance. *Id.* at 349, 92 S.Ct. at 523.

Third, similar to the situation in *Lopez,* permitting VAWA as a constitutional exercise of the commerce power would have the practical result of excessively extending Congress's power and of inappropriately tipping the balance away from the states. The *Lopez* Court placed much importance on the practical implications of permitting § 922(q) under the Commerce Clause. The practical implications in the case at hand are very similar.

■ A reasonable inference from the congressional findings is that violence against women has its major effect on the national economy. Congress focused on the effect on the national economy, and a reasonable inference, based both on Congress's focus and common sense, is that the effects on interstate travel are incidental. Showing that something affects the national economy does not suffice to show that it has a substantial effect on interstate commerce. Plaintiff uses "effects on the national economy" interchangeably with "effects on interstate commerce." This is wrong. Undoubtedly effects on the national economy in turn affect interstate commerce. Such a chain of causation alone, however, is insufficient to bring an act within the purview of the commerce power. If such a chain of causation sufficed, Con-

the practical implications analysis was unimportant, this would only bolster the importance of the nature of the regulated activity analysis and of the individual case jurisdictional requirement analysis and would increase the likelihood that, if

intrastate activity is non-economic in nature and if no requirement exists mandating a connection to commerce in each case, then Congress cannot regulate the activity under the commerce power.

gress's power would extend to an unbounded extreme. Defendants point out that facts show that insomnia costs the United States $15 billion a year (citing 2 Nat'l Comm'n On Sleep Disorders Research, *Wake Up America: A National Sleep Alert* (submitted to the U.S. Congress and the Secretary of Health and Human Services), 125–133 (1994)). This is as much as the yearly cost of domestic abuse. Other sources indicate that the cost of insomnia is much higher. *See* 140 Cong.Rec. § 14211–01, *The Economics of Insomnia* (daily ed. Oct. 5, 1994) (statement of Sen. Hatfield) (stating that a source indicates that the estimated annual economic cost of insomnia due to reduced productivity, accidents, and medical problems is between $92.5 and $107.5 billion). Insomnia undoubtedly also has some effect on interstate travel as insomniacs travel across state lines for treatment (e.g., to the nationally-renowned Johns Hopkins Sleep Disorder Center in Maryland). Insomniacs buy medicine which has traveled across state lines. Family law issues and most criminal issues affect the national economy substantially and in turn have some effect on interstate commerce. These too have interstate travel implications. However, to extend Congress's power to these issues would unreasonably tip the balance away from the states.

The fact that Congress limited VAWA, in stating that VAWA does not "confer on the courts of the United States jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree," 42 U.S.C. § 13981(e)(4), is utterly insignificant to the practical implications of accepting the regulated activity as having a substantial effect on interstate commerce. It is the logic on which Congress based its commerce power that is important. If the justification for VAWA under the Commerce Clause is constitutionally acceptable, then certainly Congress would have power to regulate much activity which should be left to state control. Similar to the situation in *Lopez*, if I accepted plaintiff's argument, I would be "hard-pressed to posit any activity by an individual that Congress is without power to regulate." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1632. In essence, if VAWA is a

permissible use of the commerce power because of the regulated activity's effect on the national economy, which in turn affects interstate commerce, then it would be inconsistent to deny the commerce power's extension into family law, most criminal laws, and even insomnia.

The combination of the insignificance of the differences between the case at hand and *Lopez* and the significance of the similarities leads to the conclusion that Congress acted beyond its commerce power in enacting VAWA. Any other conclusion would strain reason. As Justice Scalia recently stated regarding the Supreme Court, "[W]e expect both ourselves and lower courts to adhere to the 'rationale upon which the Court based the results of its earlier decisions.'" *United States v. Virginia*, —— U.S. ——, ——, 116 S.Ct. 2264, 2305, 135 L.Ed.2d 735 (Scalia, J., dissenting) (quoting *Seminole Tribe of Fla. v. Florida*, —— U.S. ——, —— —— ——, 116 S.Ct. 1114, 1128–1129, 134 L.Ed.2d 252 (1996)). A reasonable adherence to *Lopez* reveals that VAWA is not a proper use of the commerce power.

### B. The Enforcement Clause

The Fourteenth Amendment states in part, "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. It also states, "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const., amend. XIV, § 5.

### 1. Some Public Involvement Needed

■ The Supreme Court has explicitly stated that the Fourteenth Amendment regulates only state action and that some state involvement is necessary. *See, e.g., Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883) (stating that an "[i]ndividual invasion of individual rights is not the subject matter of the [Fourteenth A]mendment"); *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) (stating that the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful"); *Unit-*

ed States v. Guest, 383 U.S. 745, 755, 86 S.Ct. 1170, 1176, 16 L.Ed.2d 239 (1966) (opinion of Stevens, J.) ("It is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority"); Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 352–355, 113 S.Ct. 753, 802–804, 122 L.Ed.2d 34 (1993) (O'Connor, J., dissenting).

> Careful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct which they cannot fairly be blamed.

Lugar v. Edmondson Oil Co., 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). The Fourteenth Amendment states, "No state ... shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1 (emphasis added).

The legislative history behind the Fourteenth Amendment indicates that the congressional framers were concerned with private encroachment on civil rights. See Eugene Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich.L.Rev. 1323, 1329–1330 (1952). However, by holding that the Fourteenth Amendment applies to private conduct with a certain connection to state action, the Fourteenth Amendment can still reach some private conduct. But Supreme Court precedent and, moreover, the language of the Fourteenth Amendment require that some state involvement is necessary, even though it may be tangential.

Some authority indicates that Congress may address purely private conduct via § 5 of the Fourteenth Amendment in spite of the fact that § 1 actions require state action. In Guest, while Justice Stevens' opinion of the Court mandated some public involvement for Congress's use of the power granted by § 5 of the Fourteenth Amendment, six justices agreed that no state action was necessary for Congress's use of § 5. 383 U.S. at 762, 774–786, 86 S.Ct. at 1180, 1186–1193; see also, District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (opinion of Brennan, J.) (stating first, "The Fourteenth Amendment itself 'erects no shield against merely private conduct, however discriminatory or wrongful,'" id. at 423–424, 93 S.Ct. at 606 (quoting Shelley v. Kraemer, 334 U.S. at 13, 68 S.Ct. at 842), then stating in a footnote, "This is not to say, of course, that Congress may not proscribe purely private conduct under § 5 of the Fourteenth Amendment." Id. at 424 n. 8, 93 S.Ct. at 606 n. 8 (emphasis added)). Although Congress has certain discretion under § 5, the idea that Congress can address purely private conduct under § 5 is contrary to both the language of the Fourteenth Amendment and the Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883) (stating that § 5 permits Congress only to "adopt appropriate legislation for correcting the effects of such prohibited State laws and State acts, and thus to render them effectively null, void, and innocuous"). The Court has stressed that, even in the face of conflicting Supreme Court decisions, lower courts are not to assume that Supreme Court precedent has been implicitly overruled, see Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–1922, 104 L.Ed.2d 526 (1989), and the Court has cited the Civil Rights Cases approvingly as recently as 1982. See Lugar, 457 U.S. at 936, 102 S.Ct. at 2753.

### 2. Morgan

Even though state action was not at issue in Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), the plaintiff relies primarily on the sweeping language of Morgan in support of her position that the Fourteenth Amendment reaches private conduct. In Morgan, the Court considered whether § 4(e) of the Voting Rights Act of 1965 was constitutional under § 5 of the Fourteenth Amendment. Section 4(e) provided in relevant part that no person who successfully completed the sixth grade in public or private school in Puerto Rico in which the language of instruction was other than English shall be denied the right to vote because of an inability to read or write English. Id. at 643, 86 S.Ct. at 1719. Appellees in the case challenged § 4(e) in that it pro-

hibited the enforcement of the election laws of New York, which required an ability to read and write English as a condition of voting. *Id.* at 643–644, 86 S.Ct. at 1719–1720. Appellees attacked § 4(e) because it enabled many New York residents to vote who could not previously vote under the New York law. *Id.* at 644–645, 86 S.Ct. at 1720. The Court held that § 4(e) was a proper exercise of the powers granted to Congress by § 5 of the Fourteenth Amendment, and, by force of the Supremacy Clause, the New York English literacy requirement could not be enforced to the extent that it was inconsistent with § 4(e). *Id.* at 646–647, 86 S.Ct. at 1721. The Court stated, "A construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the [Fourteenth] Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment." *Id.* at 648, 86 S.Ct. at 1722. The Court's task was not to determine "whether the New York English literacy requirement as applied to deny the right to vote to a person who successfully completed the sixth grade in a Puerto Rico school violate[d] the Equal Protection Clause." *Id.* at 649, 86 S.Ct. at 1722–1723. Instead, the Court's task was to determine whether § 4(e) was "as required by § 5, appropriate legislation to enforce the Equal Protection Clause." *Id.* at 649–650, 86 S.Ct. at 1723.

The Court noted that § 5 has a broad scope. *Id.* at 650, 86 S.Ct. at 1723. "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Id.* (quoting *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819)). Therefore, the test is (1) whether a statute "may be regarded as an enactment to enforce the Equal Protection Clause, [ (2) ] whether it is 'plainly adapted to that end' and [ (3) ] whether it is not prohibited by but is consistent with 'the letter and spirit of the constitu-

tion.' " *Id.* at 651, 86 S.Ct. at 1724 (quoting *M'Culloch,* 17 U.S., (4 Wheat.) at 421).

Regarding the first requirement, the Court stated, "There can be no doubt that § 4(e) may be regarded as an enactment to enforce the Equal Protection Clause." *Id.* at 652, 86 S.Ct. at 1724. Congress "explicitly declared" that it enacted § 4(e) to secure rights under the Fourteenth Amendment, and "§ 4(e) may be viewed as a measure to secure for the Puerto Rican community residing in New York nondiscriminatory treatment by government." *Id.* Regarding the second requirement, the Court indicated that § 4(e) "may be readily seen as 'plainly adapted' " to furthering aims of the Equal Protection Clause. *Id.* Section 4(e) in effect "prohibit[s] New York from denying the right to vote to large segments of its Puerto Rican community" and thus enhances the Puerto Rican community's political power, which in turn "will be helpful in gaining nondiscriminatory treatment in public services for the entire Puerto Rican community." *Id.* at 652, 86 S.Ct. at 1724. "Section 4(e) thereby enables the Puerto Rican minority better to obtain 'perfect equality of civil rights and the equal protection of the laws.' " *Id.* at 652–653, 86 S.Ct. at 1724–1725. Therefore, *Morgan* involved state action (New York's statute) which caused an infringement on Fourteenth Amendment rights.

The extent of *Morgan*'s applicability to the case at hand is limited. In *Morgan,* Congress's statute invalidated a state statute and thereby remedied equal protection violations. 384 U.S. at 652–653, 86 S.Ct. at 1724–1725. Reasonably *Morgan* is limited to situations where Congress acted against state action which caused a denial of equal protection, and *Morgan* does not permit Congress to act against purely private action incidentally giving rise to state action which causes a denial of equal protection. However, *Morgan* is distinguishable on other grounds as well, as will be discussed.

### 3. VAWA

VAWA has two general purposes. It was enacted to attack gender-motivated crime against women and to supplement deficiencies in the state criminal justice system.

First, VAWA adds to state systems a remedy for the bias element of gender-motivated violent crimes against women. VAWA "attacks gender-motivated crimes that threaten women's equal rights," taking "aim at gender discrimination prohibited under the [Thirteenth] Amendment." S.Rep. No. 197, 102d Cong., 1st Sess. 53 (1991).[3] "State and Federal criminal laws do not adequately protect against the bias element of crimes of violence motivated by gender." H.R.Rep. No. 711, 103d Cong., 2d Sess. 385 (1994), U.S.Code Cong. & Admin.News 1801, 1853. The Senate found,

> [w]here a crime is shown to be motivated by gender bias, a different interest is implicated; one not adequately addressed by State tort law alone. The civil rights action provided by [T]itle III has the entirely different function of providing a special societal judgment that crimes motivated by gender bias are unacceptable because they violate the victims' civil rights. Title III singles out for enhancement bias-inspired conduct because of the unique individual and societal harm it causes. For example, the supreme [sic] Court has recognized that bias crimes are more likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite community unrest. Quoting Blackstone, " 'it is but reasonable that among crimes of different natures those should be most severely punished which are the most destructive of the public safety and happiness.' "

S.Rep. No. 138, 103d Cong., 1st Sess. 50 (1993) (footnotes omitted).

Second, purportedly VAWA "provides a 'necessary' remedy to fill the gaps and rectify the biases of existing State laws." S.Rep. No. 197 at 53. "In many States, rape survivors must overcome barriers of proof and local prejudice that other crime victims need not hurdle; they bear the burden of painful and prejudicial attacks on their credibility that other crime victims do not shoulder; they may be forced to expose their private life and intimate conduct to win a damage award

unlike any other civil litigant; and, finally, in some cases, they are barred from suit altogether by tort immunity doctrines and marital exclusions." *Id.* at 53–54. State and federal criminal laws do not "adequately provide victims of gender-motivated crimes the opportunity to vindicate their interests; existing bias and discrimination in the criminal justice system often deprives victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled." H.R.Rep. No. 711, 103d Cong., 2d Sess. 385 (1994), U.S.Code Cong. & Admin.News 1801, 1853. "Study after study has concluded that crimes disproportionately affecting women are often treated less seriously than comparable crimes affecting men." *Id.* (footnote omitted). The state criminal systems are inadequate at the police, the prosecution, and the judicial levels. *See Violence Against Women, Hearing Before the House Subcommittee on Crime and Criminal Justice,* 102d Cong., 2d Sess. 70–82 (1992) (statement and prepared statement of Margaret Rosenbaum, Assistant State Attorney, Miami, Fla.); H.R.Rep. 395, 103d Cong., 1st Sess. 27–28 (1993).

Congress has wide latitude under the Fourteenth Amendment. "Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Morgan,* 384 U.S. at 651, 86 S.Ct. at 1723–1724. Despite this broad power, Congress's acts must have some reasonable possibility of addressing a legitimate equal protection concern. Otherwise, Congress's power under the Fourteenth Amendment would be absolute. In *Morgan,* the Court found that Congress's statute "enable[d] the Puerto Rican minority better to obtain 'perfect equality of civil rights and the equal protection of the laws.' " 384 U.S. at 653, 86 S.Ct. at 1724. Implicit in this finding is that, at the least, in order for Congress to act under § 5, there must be some reasonable possibility that Congress's act is a legitimate means for remedying a legitimate end

---

**3.** The fact that Congress based this in part on gender discrimination "prohibited under the [Thirteenth] Amendment" illustrates the straw grasping in which Congress engaged. The Thirteenth Amendment applies to racial, not gender, discrimination.

(i.e., a legitimate remedy for a legitimate equal protection concern). With respect to VAWA, I will discuss (1) whether Congress's ends are legitimate and, if so, (2) whether Congress's means are legitimate.

### a. Whether Congress's Ends Are Legitimate

As stated, Congress had two ends in mind in drafting VAWA: (1) to remedy private individuals' gender-based violence and (2) to remedy gender-based deficiencies in the states' criminal justice systems.

### i. To Remedy Private Individuals' Violence

First, regarding the purpose to create a cause of action against the criminal discriminator, sufficient contacts to state action do not exist to give rise to a legitimate equal protection concern. If state action were sufficiently connected to a criminal's discriminating acts, a legitimate equal protection concern would exist. However, no such sufficient connection exists.

 "[T]he involvement of the State need [not] be either exclusive or direct. In a variety of situations the Court has found state action of a nature sufficient to create rights under the Equal Protection Clause even though the participation of the State was peripheral, or its action was only one of several co-operative forces leading to the constitutional violation." *Guest*, 383 U.S. at 755–756, 86 S.Ct. at 1177 (citations omitted). Conduct allegedly causing the deprivation of a federal right must be fairly attributable to the state. *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. Conduct causing the deprivation of a federal right may be fairly attributable if (1) "the deprivation [is] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the state is responsible" or if (2) "the party charged with the deprivation [is] a person who may fairly be said to be a state actor" (because, for example, "he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State"). *Id.* (citations omitted).

A private individual's gender-based violent crime against a woman does not qualify for either category. The deprivation caused by private individuals who commit crimes against women due to gender is not caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible. Certainly the state is not responsible in any relevant sense for individuals who commit violent crimes against women. Even with the inadequate criminal remedy for gender-motivated crimes against women, the states do not permit individuals to commit violent gender-motivated acts against women. The state action at issue (the inadequacies in the state criminal systems) does not cause, or, in any significant manner, even contribute to, the deprivation caused by the individual criminal. The private individual's decision to discriminate by committing a gender-based violent act against a woman cannot be ascribed to any governmental decision. *Cf. id.* at 938, 102 S.Ct. at 2754 (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972)). Such acts are unlawful both under state criminal and state tort laws, and, even if the states pursue their criminal laws against rape and domestic abuse less vigorously than other laws, the Court has held that if an act is unlawful, then it cannot be ascribed to any governmental decision. *See id.* at 940, 102 S.Ct. at 2755 (to say that conduct is unlawful under state law "is to say that the conduct of which petitioner complained could not be ascribed to any governmental decision; rather, respondents were acting contrary to the relevant policy articulated by the State").

The private individual criminal is also not a person who may fairly be said to be a state actor. The targets of VAWA are not state officials, but instead are the individual criminals; these targets have not acted together with or obtained significant aid from state officials; and the criminal conduct is not otherwise chargeable to the state. No possibility exists that VAWA defendants obtained significant aid from the state criminal justice systems' deficiencies in the commission of the discriminatory violent crimes. A rapist who rapes in part due to a woman's gender commits one act of discrimination, and deficien-

cies in the state criminal system effect a separate act of discrimination. Two separate acts of discrimination occur. The rapist does not rely on the state in any real sense as an accomplice to his act of discrimination. The state action related to VAWA is distinct from the discriminatory act of the private individual.

In *Guest*, the prosecutor had alleged in part in an indictment that six private individual defendants had conspired to

> injure, oppress, threaten, and intimidate Negro citizens of the United States in the free exercise and enjoyment of: "The right to the equal utilization, without discrimination upon the basis of race, of public facilities in the vicinity of Athens, Georgia, owned, operated or managed by or on behalf of the State of Georgia or any subdivision thereof."

383 U.S. at 753, 86 S.Ct. at 1175. The Court considered whether the cause of action, based on the Fourteenth Amendment, had to be dismissed because the indictment named no one alleged to have acted under the color of state law, and because "[t]he Equal Protection Clause speaks to the State or to those acting under the color of its authority." *Id.* at 754, 86 S.Ct. at 1176.

> [T]he indictment in fact contain[ed] an express allegation of state involvement sufficient at least to require the denial of a motion to dismiss. One of the means of accomplishing the object of the conspiracy, according to the indictment, was "By causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts."

*Id.* at 756, 86 S.Ct. at 1177 (footnote omitted). Three members of an earlier Court had expressed the view that a private businessman's invocation of state police and judicial action to carry out his own policy of racial discrimination was sufficient to create equal protection rights in those against whom the racial discrimination was directed. *Id.* (citing *Bell v. Maryland*, 378 U.S. 226, 242–286, 84 S.Ct. 1814, 1823–1847, 12 L.Ed.2d 822 (1964) (in *Bell*, Maryland police had arrested black students, and a Maryland court had convicted the students for participating in a sit-in. The students had appealed their con-

viction to the Supreme Court)). From the facts alleged in the indictment in *Guest*, it was possible that state officials engaged in no more than co-operative private and state action similar to that in *Bell*, but it was also possible that agents of the state actively participated in discrimination. *Id.* at 756–757, 86 S.Ct. at 1176–1177.

Unlike the statute involved in *Guest*, as exemplified by the possible extent of complicity between the state and private actors in the facts of *Guest*, there is no real possible complicity between the state criminal justice system and private actors in VAWA actions. In fact, the congressional findings do not mention such complicity. Theoretically there could be some complicity in that both the state and the criminal may discriminate against the female victim. The two acts of discrimination, however, are separate, and no indication exists that the state inaction or inadequate action against the criminal helps or encourages the criminal to commit his gender-based act of violence.

In *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947), the Court considered the validity of state courts' enforcement of private restrictive covenants having as their purpose the exclusion of blacks from the ownership or occupancy of real property. *Id.* at 4, 68 S.Ct. at 838. Blacks had occupied property subject to the restrictive covenants, and the state courts enforced the restrictive covenants, requiring the blacks to leave the property. *Id.* at 5–6, 68 S.Ct. at 838–839. The Supreme Court held that the state courts' enforcement of the restrictive covenants was sufficient state action.

> It is clear that but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint. These are not cases, as has been suggested, in which the States have merely abstained from action, leaving private individuals free to impose such discriminations as they see fit. Rather, these are cases in which the States have made available to such individuals the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in

premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell.

*Id.* at 19, 68 S.Ct. at 845.

The situation at hand differs from *Shelley* in two respects. First, the state criminal systems' insufficient treatment of perpetrators of violence against women is "merely abstaining from action" and lacks the active intervention attributed to the state courts' actions in *Shelley*. It is the state systems' inaction or inadequate action towards the violent criminals which concerned Congress. Second, unlike in *Shelley*, with VAWA no possibility exists that but for the state's inadequate action, the criminals would not commit the discriminatory crimes.

In *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), the plaintiff had been evicted from her apartment, and the city marshall had arranged for the plaintiff's possessions to be stored by Flagg Brothers in its warehouse. *Id.* at 153, 98 S.Ct. at 1732. Plaintiff disputed her moving and storage costs, and Flagg Brothers undertook to enforce its warehousemen's lien which was created by New York Uniform Commercial Code § 7–210. *Id.* at 151 n. 1, 153, 98 S.Ct. at 1731 n. 1, 1732. The Second Circuit found that because the state statute had created the lien which permitted a private individual to, in effect, violate the due process clause, there was sufficient state involvement to satisfy the state action requirement. *Id.* at 154–155, 98 S.Ct. at 1732–1733. The Supreme Court disagreed, stating,

> While as a factual matter any person with sufficient physical power may deprive a person of his property, only a state or private person whose actions "may be fairly treated as that of the state itself" ... may deprive him of "an interest encompassed within the Fourteenth Amendment's protection."

*Id.* at 157, 98 S.Ct. at 1734 (citations omitted).

> This Court ... has never held that a State's mere acquiescence in a private action converts that action into that of the State.... [Certain] cases clearly rejected the notion that our prior cases permitted the imposition of Fourteenth Amendment

restraints on private action by the simple device of characterizing the State's inaction as "authorization" or "encouragement."

*Id.* at 164–165, 98 S.Ct. at 1737–1738 (citations omitted). The Court found that there was a "total absence of overt official involvement," *id.* at 157, 98 S.Ct. at 1734 (citations omitted), in spite of the fact that state officials had passed § 7–210. "It would intolerably broaden, beyond the scope of any of our previous cases, the notion of state action under the Fourteenth Amendment to hold that the mere existence of a body of property law in a State, whether decisional or statutory, itself amounted to 'state action' even though no state process or state officials were ever involved in enforcing that body of law." *Id.* at 160 n. 10, 98 S.Ct. at 1735 n. 10.

VAWA is unlike *Flagg Brothers* in that VAWA involves active current decisions by state actors and in that VAWA involves the method of enforcement of laws as well as the bodies of laws themselves. However, more relevantly, similar to *Flagg Brothers,* VAWA involves state inaction or inadequate action towards the individual causing the deprivation, and VAWA involves no overt official involvement. Following the logic of *Flagg Brothers,* this is not authorization or encouragement of the deprivation.

In *Lugar,* the Court considered in part whether private individuals' use of state officials to take advantage of state-created attachment procedures constituted sufficient state action. *Lugar,* 457 U.S. at 942, 102 S.Ct. at 2756. The Court held that such joint participation between private individuals and the state sufficed to make the conduct fairly attributable to the state. *Id.* Due to the private party's joint participation with the state officials, the private party was a "state actor." *Id.* at 941–942, 102 S.Ct. at 2756. This is different from VAWA which involves situations where private individuals do not act together with or receive any significant aid from the state in the commission of the violent act.

Therefore, remedying private individuals' gender-based crimes is not a legitimate equal

protection goal due to the fact that no sufficient state contacts exist.

### ii. To Remedy Deficiencies in State System

Some possibility exists that at least part of the states' differential treatment of gender-based violent crimes against women is due to gender discrimination, and so correcting the differential treatment arising out of gender discrimination is a legitimate Fourteenth Amendment concern. Considering Congress's broad discretion, a legitimate equal protection concern exists within state criminal justice systems.

### b. Whether Congress's Means Are Legitimate

As stated, Congress's purpose to remedy discrimination by private individuals who commit gender-based violent crime against a woman is an illegitimate Fourteenth Amendment end, and so addressing whether the means sufficiently address this end is unnecessary. In contrast, the purpose to remedy deficiencies in the state system is a legitimate end, but no reasonable possibility exists that VAWA will help remedy this legitimate Fourteenth Amendment concern.

The § 5 analysis scheme presented in *Morgan* focused on whether an act of Congress remedies a legitimate Fourteenth Amendment concern. In *Morgan* the Court found that Congress's act would remedy a legitimate equal protection concern. *Morgan*, 384 U.S. at 652–653, 86 S.Ct. at 1724–25. At least a reasonable possibility must exist that Congress's act remedies a legitimate Fourteenth Amendment concern. While remedying the state criminal system's deficiencies is a legitimate Fourteenth Amendment concern, VAWA does not address this concern, because VAWA provides no remedy for the deficiencies. It does not provide a remedy to the victim for the denial of the victim's equal protection rights by either undoing or stopping the specific equal protection violation or by compensating the victim for the violation, nor does it provide a remedy against the Fourteenth Amendment violator.

Clearly VAWA does not undo or stop the violations in the states' criminal justice systems. Also, it does not adequately compensate victims for the denial of their equal protection rights. VAWA is tailored to remedy conduct other than the conduct giving rise to the equal protection concern. VAWA compensates victims for the violence directed against them because of their gender, not for the states' denial of equal protection. If in a certain case VAWA comes close to accurately remedying deficiencies in the states' systems, it is purely by chance. To illustrate the problem, clear examples exist whereby VAWA will not compensate victims for the states' denial of women's equal protection rights. The statute is overbroad: many women who do not suffer Fourteenth Amendment violations at the hands of the state system would still have a VAWA claim. A woman in a state with fair rape laws who is raped and whose rapist receives the maximum sentence may still have a VAWA claim. That woman may receive compensation *via* VAWA despite having suffered no denial of her equal protection rights. VAWA is also too narrow: many women who suffer clear violations of their Fourteenth Amendment rights would not have a VAWA remedy, because the crime was not based on the woman's gender. These women would not receive any compensation despite the fact that the states clearly denied them equal protection of the laws.

The aim of legislation to cure Fourteenth Amendment violations should be at the entity which causes the violation. In this case that entity is the states. VAWA does not address the states, which are the perpetrators of the Fourteenth Amendment violation; it is wholly silent about the conduct of the various states in their handling of rape and other violent crimes against women. Consequently, VAWA does nothing to discourage the Fourteenth Amendment violations which occur in the state criminal systems. Instead of addressing the Fourteenth Amendment violation by the states' criminal justice system, VAWA authorizes a cause of action against an individual who did not contribute in any real sense to the unequal treatment in the states' criminal justice systems. In *Guest*, the individuals subject to the cause of action had allegedly involved the state to deprive blacks of equal protection rights. The indi-

viduals and the state were possibly conspirators to deprive equal protection. The cause of action at issue in *Guest* was a remedy against possible Fourteenth Amendment violation perpetrators. Unlike *Guest*, the private acts which VAWA targets are incidental to the Fourteenth Amendment violation. Therefore, VAWA provides no remedy against the Fourteenth Amendment violation perpetrator.

No reasonable possibility exists that, in enacting VAWA, Congress has enforced the Fourteenth Amendment mandate that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. No reasonable possibility exists that VAWA will remedy any legitimate Fourteenth Amendment concern.

## VI. Conclusion

Without a doubt violence against women is a pervasive and troublesome aspect of American life which needs thoughtful attention. But Congress is not invested with the authority to cure all of the ills of mankind. Its authority to act is limited by the Constitution, and the constitutional limits must be respected if our federal system is to survive. Congress's reliance on the Commerce Clause and the Fourteenth Amendment to support its authority to enact VAWA is misplaced. This is not to say that Congress is powerless to address the problem of violence against women. A properly drafted statute within the parameters of the Fourteenth Amendment, as interpreted by the Supreme Court could certainly be crafted.

Although plaintiff states a claim under VAWA for purpose of Fed.R.Civ.P. 12(b)(6), VAWA is an unconstitutional exercise of Congress's power, unjustified under either the Commerce Clause or the Enforcement Clause of the Fourteenth Amendment. Consequently, defendants' motion to dismiss the VAWA claims with prejudice is granted. I decline to exercise supplemental jurisdiction over the state claims and dismiss these without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

The clerk will enter an appropriate order.

For the reasons stated in the accompanying memorandum opinion, the Violence Against Women Act, 42 U.S.C. § 13981, claims against Antonio Morrison and James Crawford are dismissed with prejudice. The state claims are dismissed without prejudice. The case is dismissed. The Clerk is directed to remove the case from the docket and to certify copies of this order and the accompanying memorandum opinion to all counsel of record.