Elizabeth **CRISONINO**, Plaintiff,

v.

**NEW YORK CITY HOUSING AUTHORITY, Ruben Franco, David Burney, and Kenneth Eisenstat, Defendants.**

No. 96 Civ. 9742(HB).

United States District Court, S.D. New York.

Nov. 18, 1997.

John A. Beranbaum, New York City, for Elizabeth Crisonino.

Jennifier Kay Brown, U.S. Atty.'s Office, Southern Dist. of New York, New York City, for U.S.

## OPINION AND ORDER

BAER, District Judge.

Defendants move for summary judgment on plaintiff's federal claims and for dismissal of the pendant state-law claims. For the reasons discussed below the motion is GRANTED in part and DENIED in part.

## BACKGROUND

Plaintiff Elizabeth Crisonino was employed as an architect by defendant New York City Housing Authority ("NYCHA") from January 23, 1995 until her termination on January 19, 1996. She was called to jury duty in this Court on or about November 20, 1995 and was chosen to serve on a criminal trial expected to last two months. Plaintiff notified NYCHA of her jury duty and sought to comply with the agency's requirements so as to ensure that she would continue to receive her paycheck in a timely manner. While the plaintiff had disagreements with her superior Mr. Eisenstat in the past, the saga underlying this lawsuit appears to have begun on January 4, 1996, when her paycheck was withheld. Apparently, there was some misunderstanding between the parties as to the procedures to be followed. As a result, on January 12, 1996 a memo was prepared to suspend plaintiff from the active payroll. On January 16, 1996, the next business day, the payroll suspension was rescinded. Two days later, plaintiff submitted reimbursement checks to NYCHA.[1]

The following day, January 19, 1996, proved fateful. On that date, plaintiff entered the office of defendant Kenneth Eisenstat, the Assistant Director for Op-

erations at NYCHA, and asked for her paycheck. There is no dispute that Eisenstat refused to give plaintiff her check because he believed she had not yet properly reimbursed the agency. *Compare* Eisenstat Aff. ¶ 4; Crisonino Aff. ¶ 23. What follows is the subject of much dispute. According to plaintiff, Eisenstat called her a "dumb bitch" and she left. Later, when she returned to his office intent on picking up her paycheck, she was again refused and, after she used a profanity, plaintiff alleges that Eisenstat stood up, walked around his desk and shoved her so hard that she fell backward and hit the floor, sustaining injuries from which she has yet to fully recover. According to Eisenstat, when plaintiff returned to his office she interrupted a meeting he was having, demanded her check, swore at him, and began walking toward him, at which time he stood up and was struck in the chest by the plaintiff, who grabbed his shirt and began kicking him. Several co-workers who had witnessed some or all of the confrontation managed to separate the two. Plaintiff was immediately suspended from her duties and later that day she was fired.

After being terminated from her employment, plaintiff filed criminal charges against Eisenstat. The initial charge was Assault in the Third Degree. *See* Penal Law § 120.00. charge was later reduced to Harassment in the Second Degree. *See* Penal Law § 240.26(1). Plaintiff also filed a complaint against Eisenstat and his supervisor, defendant David Burney, with NYCHA's Inspector General. The complaint, alleging sexual harassment and that plaintiff had been discriminated against on the basis of her sex, was apparently transferred to the agency's Department of Equal Opportunity ("DEO"). DEO conducted an investigation and concluded that plaintiff's allegations were unfounded.

Plaintiff also filed this lawsuit, in which she asserts the following causes of action against the defendants: (i) violation of the Jury Duty

---

1. The Plaintiff was required to pay over to NYCHA the payments she received from the Court in order to receive her paycheck.

Act, 28 U.S.C. § 1875;[2] (ii) violation of the Gender Motivated Violence Act, 42 U.S.C. § 13981; (iii) violation of her equal protection rights, presumably pursuant to 42 U.S.C. § 1983; (iv) violation of her right to privacy and substantive due process, also presumably pursuant to 42 U.S.C. § 1983; (v) violation of Title VII, 42 U.S.C. §§ 1981A, 2000e *et seq.;* and (vi) various state and city law claims. Defendants have moved for summary judgment on the enumerated federal claims and for dismissal of the state law claims.

## DISCUSSION

Summary judgment can be granted only where there is no material issue of fact. It is beyond peradventure that whether Mr. Eisenstat called plaintiff a "dumb bitch" and shoved her to the ground, as she claims, or whether she attacked him, as he claims, is a material issue of fact. Defendants have submitted four affidavits supporting Eisenstat's account of the incident: Eisenstat's and those of three eyewitness, all of whom claim plaintiff grabbed Eisenstat's shirt and began kicking him. *See* Eisenstat Aff. ¶¶ 11, 12; Wilkerson Aff. ¶ 15; Positino Aff. ¶ 9; Burney Aff. ¶ 3.[3] Plaintiff relies on her version of the event. Crisonino Aff. ¶ 27. Although defendants' affidavits outnumber plaintiff's, summary judgment is not a numbers game and in this instance requires an assessment of credibility by a jury, not the Court. In ruling on a motion for summary judgment, the Court is bound to assume that the incident occurred as described by plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (availability of summary judgment does not authorize "trial on affidavits"). With that in mind, I examine the sufficiency of each of plaintiff's federal causes of action.

2. Plaintiff has voluntarily dropped her Jury Duty claim and that claim is hereby dismissed.

3. Burney admits that he did not see the beginning of the altercation and thus has no personal knowledge as to who started it. Burney Depo. at 80.

4. Plaintiff clarified in her opposition papers that the Title VII claim is asserted against NYCHA only. Any Title VII claims against the individual defendants are dismissed.

## I. Title VII

Plaintiff asserts that defendant NY-CHA[4] violated her rights under Title VII by creating a sexually hostile work environment.[5] "A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of employment.'" *Torres v. Pisano,* 116 F.3d 625, 630–31 (2d Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)), *petition for cert. filed,* 66 U.S.L.W. 3283 (1997). Although "isolated, minor episodes of harassment do not merit relief under Title VII," the Court of Appeals has noted that "even a single episode of harassment, if severe enough, can establish a hostile work environment." *Id.* at 631 n. 4; *see also Tomka v. Seiler,* 66 F.3d 1295, 1305 (2d Cir.1995) ("even a single incident of *sexual* assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII") (emphasis added).

Plaintiff here alleges a single incident of assault. Whether this assault can form the basis for any hostile work environment charge is a close question. Plaintiff relies on the fact that Eisenstat touched her "above the breast" when he pushed her and the fact that he referred to her as a "dumb bitch" earlier in the morning to show that the assault was sexual in nature. Defendants argue that a single stray remark is insufficient to establish gender animus. The cases on which defendants rely are distinguishable, however, in that the remarks at issue there had no nexus to the complained-of action.

5. While defendants addressed plaintiff's claim as if it were based on discriminatory termination, rather than the allegedly hostile work environment created by the alleged assault, plaintiff's complaint clearly states that she is pursuing a claim based on "a sexually hostile environment". Compl. ¶ 74. Plaintiff does not appear to be pursuing a discriminatory termination claim.

See Arroyo v. New York State Ins. Dep't, No. 91 Civ. 4200(MBM), 1995 WL 611326 (S.D.N.Y. Oct. 18, 1995), aff'd, 104 F.3d 349 (2d Cir.1996); O'Connor v. Viacom, Inc., No. 93 Civ. 2399(LMM), 1996 WL 194299 (S.D.N.Y. April 23, 1996), aff'd, 104 F.3d 356 (2d Cir.1996). By contrast, the remark at issue here was closely followed by the alleged assault. The Court of Appeals has recognized that "stray remarks" can suffice to establish a prima facie case in the appropriate circumstances. See Kirschner v. Office of the Comptroller, 973 F.2d 88, 93 (2d Cir. 1992). While this is a close question, it is a question for the jury. See Torres, 116 F.3d at 633 ("jury question as to whether [defendant's] conduct created a hostile work environment").

▆▆▆ Having barely survived summary judgment with respect to whether the incident was sufficiently severe or sexually related so as to meet the requirements for a hostile work environment charge, let me turn to whether plaintiff has established facts that could make NYCHA liable for the conduct of its employees. Id. at 633–34. The Circuit has recently held that "an employer will be held liable for the harassment perpetrated by one of its supervisors" only in enumerated circumstances, including when "the employer provided no reasonable avenue for complaint." Id. at 634. Defendant contends that the fact that the DEO investigated plaintiff's complaint, albeit months after she was fired, constitutes a "reasonable avenue of complaint." I disagree. The mere existence of sexual harassment complaint procedures does not immunize defendant. Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1180–81 (2d Cir.1996). "The question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury," id. at 1181, especially where, as here, plaintiff was discharged prior to any investigation whatsoever. Defendant's motion to dismiss plaintiff's Title VII hostile work environment claim against NYCHA is denied.

## II. Section 1983

Plaintiff has also asserted two Section 1983 claims: one for violation of her equal protection rights (count three) and one for violation of her substantive due process right to bodily integrity (count four). Defendant has moved for summary judgment on both counts on various grounds. Plaintiff's allegations and defendants' motion must be assessed separately with respect to each defendant.

## A. NYCHA

▆▆▆ Any Section 1983 claims against NYCHA must be dismissed. To state a claim against a municipality or a municipal agency, plaintiff must allege either that the complained-of act was a result of a pattern or practice or that some other basis for liability—other than respondeat superior—exists. See Monell v. Department of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). Plaintiff seek to hold NYCHA liable on the theory that defendant Franco's decision to suspend and terminate plaintiff's employment constitutes a decision by an official with policymaking authority and is therefore imputable to the agency. See Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1299–1300, 89 L.Ed.2d 452 (1986). This Court has recently rejected just such a claim. Ramos v. City of New York, No. 96 Civ. 3787(DLC), 1997 WL 410493 (S.D.N.Y. July 22, 1997) (NYCHA Board of Directors, and not Franco individually, has final policymaking authority). Plaintiff's attempt to impute Section 1983 liability to NYCHA therefore must fail and the Section 1983 claims against NYCHA are hereby dismissed.

## B. Individual Defendants

Defendants seek the dismissal of the Section 1983 claims against the individual defendants on the basis that "plaintiff cannot demonstrate that the defendants' actions were based on an impermissible motive," Def. Br. at 11, relying on the same arguments made with respect to the Title VII claim. Having found that there is a question of fact as to whether Eisenstat's actions evinced a discriminatory intent, it follows that Burney's actions in immediately suspending plaintiff, and Burney's and Franco's actions in concurring in plaintiff's dismissal raise the same questions as to their intent. The motion with

respect to the Section 1983 claims against the individual defendants is denied.[6]

## III. Gender Motivated Violence Act

Plaintiff also brings a claim under the civil enforcement provisions of the Gender–Motivated Violence Act ("GMVA" or the "Act"), 42 U.S.C. § 13981, enacted in 1994. Defendant moves to dismiss this claim on the grounds that (i) plaintiff has failed to state a claim and (ii) the Act is unconstitutional. This Circuit has not yet addressed this issue.

### A. Failure to State a Claim

■ The GMVA provides that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender," 42 U.S.C. § 13981(b), and provides for a private cause of action for violations of that right, 42 U.S.C. § 13981(c). To state a claim under the GMVA, therefore, plaintiff must allege that (i) she was the victim of a gender-motivated crime and (ii) the crime was a crime of violence.[7]

### 1. Gender-Motivated Crime

■ The term "crime of violence motivated by gender" is defined in the Act as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1). The Act goes on to specify, however, that the Act is inapplicable to "random acts of violence unrelated to gender." 42 U.S.C. § 13981(e)(1). This is apparently an attempt to codify Congress' concern that the Act not provide a cause of action for all female victims of violence, regardless of the motive. *See* S.Rep. No. 103–138, at 49 (1993) ("The

committee is not asserting that all crimes against women are gender-motivated.").

■ The Act's definition of gender-motivated crime is based on Title VII. *Doe v. Hartz*, 970 F.Supp. 1375, 1407 (N.D.Iowa 1997) (citing S.Rep. No. 103–138, at 52 (1993)); *Brzonkala v. Virginia Polytechnic and State University*, 935 F.Supp. 779, 784 (W.D.Va.1996) (citing S.Rep. No. 102–197, at 50 (1991)). Congress explained that "[p]roof of 'gender motivation' under [VAWA's civil rights provision] should proceed in the same ways proof of race or sex discrimination proceeds under other civil rights laws." S.Rep. No. 103–138, at 52 (1993). The Court must therefore draw from Title VII caselaw in deciding this motion. See id. at 53 ("This body of case law will provide substantial guidance to the trier of fact in assessing whether the requisite discrimination was present."). As amici note, the appropriate determination as to whether a particular act of violence is gender motivated is to be made based on the "totality of circumstances." Amici Br. at 17–20 (citing cases).

■ Intent—or "animus"—in such cases is usually a question of fact. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). If for instance Eisenstat called plaintiff a "dumb bitch" and later shoved her to the ground, this would allow a reasonable jury to conclude that his actions were committed because of plaintiff's gender and were due, at least in part, to an animus based on her gender. Accordingly, plaintiff has adequately pled the first element of a GMVA claim.

6. Defendants have not challenged, and the Court reaches no decision respecting, the sufficiency of plaintiff's constitutional allegations, i.e., whether the acts alleged rise to the level of a constitutional violation of equal protection or substantive due process. Such a decision will, in the first instance, be for the jury.

7. One district court has stated that a third element must be pled: deprivation of the right to be free from crimes of violence motivated by gender. *Doe v. Hartz*, 970 F.Supp. 1375, 1393 (N.D.Iowa 1997). The *Hartz* court, however, noted that "this element appears tautologous." *Id.* That is, if one commits a crime of violence

motivated by gender one has necessarily deprived another of the right to be free of gender-motivated crimes of violence. *See* 42 U.S.C. § 13981(b) ("[a]ll persons ... have the right to be free from crimes of violence motivated by gender"). The *Hartz* court went on to explain that this third element demonstrates that plaintiff need not establish any actual damages—deprivation of the right is sufficient injury to state a claim. *Id.* The Court agrees that no actual damages need be pled by the plaintiff; the third element stated by the *Hartz* court, however, appears superfluous.

## 2. Crime of Violence

The GMVA defines "crime of violence" as an act that would constitute a felony under state or federal law. 42 U.S.C. § 13981(d)(2)(A).[8] Defendants contend that plaintiff has failed to allege that Eisenstat committed such a "crime of violence" for two reasons. First, defendants argue that because the criminal charges brought against Eisenstat did not charge a felony, his acts, do not constitute a "crime of violence." Second, defendants argue that in any event Eisenstat's conduct was not felonious and is therefore not actionable under the GMVA.

### a. Criminal Charges

■■■ Defendants first point to the fact that the criminal charge ultimately filed against Eisenstat by the district attorney was harassment in the second degree, not a felony under New York law. Therefore, defendants argue, the complained-of conduct does not constitute a "crime of violence" under the Act and plaintiff's claim must be dismissed. The Court has not located any prior decisions addressing defendants' argument that when criminal charges are brought against a defendant, those charges are determinative of whether the defendant's acts constitute a "crime of violence" for purposes of the GMVA.

■■■ To the contrary, my examination of the plain language of the statute and its legislative history makes clear that the criminal charges filed against a defendant do not determine whether the predicate offense qualifies as a "crime of violence" under the Act. The statute itself provides that "[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c) of this section." 42

U.S.C. § 13981(e)(2). While this statement does not speak specifically of those cases in which prior criminal charges have been filed, it supports a conclusion that when such charges are filed they should not determine whether the predicate act qualifies as a "crime of violence." A holding to the contrary would lead to the result that in those cases in which no criminal charges are filed (presumably because the incident in question was not sufficiently serious) plaintiffs would be free to proceed with their GMVA claim, simply by alleging that the act constitutes a felony, while in some cases in which criminal charges were filed plaintiffs would be precluded from bringing a GMVA claim.

■■■ Such a result would place an effective "veto" power in the hands of local prosecutors: if they chose to charge defendants with misdemeanors rather than felonies, the victims of the violence would be precluded from bringing a GMVA claim. While prosecutors have the power to decline prosecution altogether, it was in large measure on that ground that the GMVA was passed and consequently it is unlikely indeed that Congress intended that plaintiffs such as Elizabeth Crisonino be subject to such decisions. *See, e.g.,* H.R. Conf. Rep. No. 103–711, at 385 (1994), *reprinted at* 1994 U.S.C.C.A.N. 1839, 1853 ("bias and discrimination in the criminal justice system often deprives [sic] victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled"); S.Rep. No. 103–138, at 49 (1993) ("Study after study has concluded that crimes disproportionately affecting women are often treated less seriously than comparable crimes affecting men."). The Court therefore rejects defendants' argument that because Eisenstat was eventually charged

---

**8.** The statute's definition of "crime of violence" requires that the offense "constitute a felony *against the person* or … a felony against property if the conduct presents a serious risk of physical injury to another, and that [it] come within the meaning of State or Federal offenses described in section 16 of Title 18." 42 U.S.C. § 13981(d)(2)(A). Section 16 of Title 18 in turn defines "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Defendants do not argue that the alleged altercation does not constitute an offense against the person. *Compare Hartz,* 970 F.Supp. at 1400–04 (discussing how to determine if an alleged act constitutes an offense against the person). The *Hartz* court also noted, correctly, that the Act does not indicate whether the crime of violence must be a felony under state law, federal law, or either. *Id.* at 1397. *Hartz* concluded, as do I, that the term "felony" refers to a felony under applicable state *or* federal law.

with a crime not constituting a felony plaintiff cannot, as a matter of law, state a GMVA claim. The determination of whether the predicate act constitutes a "crime of violence" under the Act is a question for the Court or the jury, as appropriate. While the nature of the charges brought against a defendant may inform the Court's decision as to whether plaintiff has stated a claim, those charges alone are not determinative of whether a defendant's actions constitute a "crime of violence" under the Act.[9]

### b. Felonious Conduct

Defendants also argue that, regardless of the charges brought against Eisenstat, his actions simply do not constitute a felony under New York or federal law. Viewing the allegations in the light most favorable to the plaintiff, defendants are plainly wrong. Under New York law, "[a] person is guilty of assault in the second degree when: [w]ith intent to cause serious physical injury to another person, he causes such injury to such person or a third person." N.Y. Penal Law § 120.05(1). "Serious physical injury" is defined as "physical injury ... which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00. Assault in the second degree is a class D felony under New York law.[10]

■ Plaintiff alleges in her complaint that "Eisenstat violently pushed [her] to the ground, causing injuries to her chest, head, neck, shoulder and arm." Compl. 1 25. She has also submitted an affidavit in opposition to defendants' motion in which she states that as a result of her injuries she could not engage in manual drafting (an essential function of her job as an architect) until at least December 1996; that she avoided using her left arm because of pain until June 1997; that she still suffers sharp neck pains when she turns her head and that she suffered severe psychological trauma. Crisonino Aff. ¶¶ 40–43. She also submitted medical reports corroborating her claims. See Berenbaum Aff. Exhs. M–Q. Should a jury credit plaintiff's claims, it would certainly be entitled to conclude that Eisenstat's actions caused plaintiff "protracted impairment of health or protracted loss or impairment of the function of any bodily organ" as required by the statute. As noted above, New York law also requires that defendant have acted with intent to cause serious physical injury. Such a question is one of fact, inappropriate for resolution on summary judgment on this record. Having alleged facts sufficient to support a finding that Eisenstat's conduct constituted a felony, plaintiff is entitled to have a jury determine whether that is in fact the case. See Hartz, 970 F.Supp. at 1402 ("If the court finds as a matter of law that the crime [alleged] constitutes a crime of violence within the meaning of the [GMVA], then the jury will decide as a matter of fact whether the elements constituting a felony have in fact been proved in the particular case.").

### B. Constitutionality[11]

■ Having determined that plaintiff states a valid claim under the GMVA, I turn to defendants' allegation that the Act is unconstitutional. The Court has located only five other opinions addressing the constitutionality of the Act's civil remedies provision: *Anisimov v. Lake*, 982 F.Supp. 531 (N.D.Ill. 1997); *Seaton v. Seaton*, 971 F.Supp. 1188 (E.D.Tenn.1997); *Doe v. Hartz*, 970 F.Supp. 1375 (N.D.Iowa 1997) ("*Hartz*"), *reversed in part, vacated in part*, 134 F.3d 1339 (8th

---

9. The Court is doubtful that the nature of the charge would be admissible before a jury, but does not reach this issue.

10. Like federal law, New York defines a felony as an offense for which a term of imprisonment in excess of one year may be imposed. N.Y. Penal Law § 10.00(5). *Compare* 18 U.S.C. § 3559(a).

11. The Court thanks Assistant United States Attorney Jennifer K. Brown, who filed a brief on behalf of the United States, and Julie Goldscheid, Andrea B. Williams, Martha F. Davis and Julie Levy, who filed a brief on behalf Amici Curiae NOW Legal Defense and Education Fund, Center for Battered Women's Legal Services, Center for Women Policy Studies, Equal Rights Advocates, Jewish Women International, National Coalition Against Domestic Violence, National Network to End Domestic Violence, New York State Coalition Against Sexual Assault and the Women's Law Project, in support of the Act's constitutionality. Both briefs were helpful to the Court in reviewing the Act's extensive legislative history and analyzing its constitutional implications.

Cir.1998); *Brzonkala v. Virginia Polytechnic and State University,* 935 F.Supp. 779 (W.D.Va.1996), *appeal pending,* 132 F.3d 949 (4th Cir.1997); and *Doe v. Doe,* 929 F.Supp. 608 (D.Conn.1996) *("Doe").*[12] All but *Brzonkala* upheld the GMVA as a valid exercise of Congress' Commerce Clause power.

In enacting the GMVA, Congress grounded its authority on two constitutional provisions, the Commerce Clause and Section 5 of the Fourteenth Amendment. *See* 42 U.S.C. § 13981(a).[13] The Commerce Clause grants Congress the authority to "regulate Commerce ... among the several States...." U.S. Const., art. I, § 8. Although by its terms it appears to allow only the regulation of commerce, its interpretation over the years has permitted a broad scope of Congressional authority. *See United States v. Lopez,* 514 U.S. 549, 553–58, 115 S.Ct. 1624, 1626–29, 131 L.Ed.2d 626 (1995) (describing history of Commerce Clause jurisprudence). This expansive interpretation reached its height in the 1930's and 40's with the Supreme Court's "watershed" decisions in *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (upholding National Labor Relations Act), *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding Fair Labor Standards Act), and *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (upholding application of amendments to Agricultural Adjustment Act of 1938 to homegrown wheat). *See Lopez,* 514 U.S. at 555–56, 115 S.Ct. at 1627–28. For half a century thereafter, Congress' authority to act pursuant to the Commerce Clause was not restricted.

### 1. Lopez

Two years ago, however, the Supreme Court reaffirmed that Congress' Commerce Clause authority is "subject to outer limits." *Id.* at 557, 115 S.Ct. at 1628–29. In *Lopez* the Court struck down the Gun–Free School Zones Act of 1990, holding that it exceeded Congress' authority to regulate commerce. In so doing, the Court also sent a signal to Congress and the lower courts that Congressional authority is indeed limited and that Congressional actions at the outer limits of that authority must be scrutinized to ensure that the federal system of government "adopted by the Framers to ensure protection of our fundamental liberties," *id.* at 552, 115 S.Ct. at 1626 (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 2399–2400, 115 L.Ed.2d 410 (1991)), is not rendered nugatory by a Congress with general police powers. *See id.* at 564, 115 S.Ct. at 1632.

*Lopez* also provides the lower courts with a framework to evaluate Congress' authority under the Commerce Clause. The *Lopez* Court reiterated the three categories of activity that Congress may regulate pursuant to the Commerce Clause: (1) the "use of channels of interstate commerce"; (2) the "instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Id.* at 558–59, 115 S.Ct. at 1629–30 (citation omitted). Only the third category can provide the authority for enactment of the GMVA, and it is there that the Court's analysis must be focused. *See Anisimov,* 982 F.Supp. at 537 n. 3; *Seaton,* 971 F.Supp. at 1192; *Hartz,* 970 F.Supp. at 1415; *Doe,* 929 F.Supp. at 612; *Brzonkala,* 935 F.Supp. at 786.

---

**12.** Other Courts have addressed the constitutionality of the Act's criminal provisions. *See United States v. Gluzman,* 953 F.Supp. 84 (S.D.N.Y. 1997) (upholding constitutionality under Congress' Commerce Clause power); *United States v. Bailey,* 112 F.3d 758 (4th Cir.1997) (same), *cert. denied,* —— U.S. ——, 118 S.Ct. 240, 139 L.Ed.2d 170 (1997); *United States v. Wright,* 965 F.Supp. 1307 (D.Neb.1997) (holding criminal statute is unconstitutional exercise of Congressional power under Commerce Clause). Because of the very different nature of the criminal provisions at issue in these cases, they are of limited value in determining the constitutionality of the civil remedy provisions at issue here.

**13.** As the Court finds that the Act is a constitutional exercise of Congress' power pursuant to the Commerce Clause, it does not address whether it is also appropriate pursuant to Section 5 of the Fourteenth Amendment. *See, e.g., Doe,* 929 F.Supp. at 612 n. 5.

In assessing whether the Act at issue in *Lopez* was within Congress' power, the Court first reaffirmed that "the proper test requires an analysis of whether the regulated activity substantially affects' interstate commerce." *Lopez*, 514 U.S. at 559, 115 S.Ct. at 1630 (emphasis added). In conducting this analysis the Court applied a "rational basis" test—i.e., it examined "whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." *Lopez*, 514 U.S. at 557, 115 S.Ct. at 1629 (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276–80, 101 S.Ct. 2352, 2360–62, 69 L.Ed.2d 1 (1981)). In determining whether such a rational basis exists, the Court instructed that it makes an "independent evaluation" of constitutionality. *Lopez*, 514 U.S. at 562, 115 S.Ct. at 1631. Nevertheless, it acknowledged that it "of course consider[s] legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce." *Id.* There were, however, no such findings in *Lopez* and no "substantial effect was visible to the naked eye." *Id.* at 563, 115 S.Ct. at 1632. After reviewing the asserted "substantial effects" put forth by the government in defense of the statute, the Court concluded that the possession of guns near schools did not "substantially effect" interstate commerce.

### 2. Legislative Findings

The record in support of Congress' authority to enact the GMVA could not be more different rent than that facing the *Lopez* Court. Congress conducted four years of hearing and study before enacting the GMVA, *Anisimov*, 982 F.Supp. at 536–37; *Seaton*, 971 F.Supp. at 1192; *Hartz*, 970 F.Supp. at 1421; *Doe*, 929 F.Supp. at 611, and made voluminous legislative findings regarding the impact domestic and other gender-motivated violence has on the national economy and interstate commerce. Congress heard testimony from "law enforce-

ment officials, anti-domestic violence organizations, rape crisis centers, psychiatrists, other mental health experts, physicians, law professors, ... state Attorneys General, and victims of domestic violence." *Doe*, 929 F.Supp. at 611. Some of the more compelling testimony and Congressional findings include: [14]

- Domestic violence costs employers between $3 to $5 billion annually as a result of absenteeism. 139 Cong. Rec. H10349–01, at H10365 (Nov. 20, 1997) (statement of Sally Goldfarb, NOW Legal Defense and Education Fund).
- "Gender-based violence bars its most likely targets—women—from full [participation] in the national economy." S.Rep. No. 103–138 at 54 (1993).
- The nation spends $5 to $10 billion a year on health care, criminal justice and other costs related to domestic violence. *Id.* at 41.
- "[A]lmost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime." *Id.* at 54.
- "As many as 50 percent of homeless women and children are fleeing domestic violence." S.Rep. No. 101–545, at 37 (1990).
- Homicide is the leading cause of death for women in the workplace. S.Rep. No. 103–138, at 54 n. 70.
- "[F]ear of gender-based violence ... deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence." *Id.* at 54.

Following four years of hearings, Congress concluded that "[g]ender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer expending, all of which affect interstate commerce and the national economy." S.Rep. No. 103–138, at 54 (1993). See also H.R. Conf. Rep. 103–711, at 385 (1994) ("crimes of violence motivated by gender

---

**14.** Congress also made extensive findings regarding the scope of the gender-motivated violence problem. *See Anisimov*, 982 F.Supp. at 536–38. These findings included such shocking statistics as the fact that violence is the leading cause of injury to women ages 15–44; American women are three times as likely to be raped than European women; and three of four American women will be victims of violent crime sometime during their life. *Id.* Such findings, without more, do not establish that gender-motivated violence has a substantial effect on interstate commerce.

have a substantial effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce"), *reprinted at* 1994 U.S.C.C.A.N. 1839, 1853.

 "Clearly, just because Congress says that an activity affects interstate commerce does not make it so." *Seaton,* 971 F.Supp. at 1193; *see also Doe,* 929 F.Supp. at 614 ("whether a particular activity substantially affects interstate commerce is 'ultimately a judicial rather than a legislative question'") (quoting *Lopez,* 514 U.S. at 557 n. 2, 115 S.Ct. at 1629 n. 2). The question of whether a regulated activity substantially affects interstate commerce "is necessarily one of degree." *Lopez,* 514 U.S. at 566, 115 S.Ct. at 1633. In light of the extensive legislative findings regarding the effect of gender-motivated violence, I find a rational basis for the conclusion by Congress that gender-motivated violence substantially affects interstate commerce. *Anisimov,* 982 F.Supp. at 538–39; *Seaton,* 971 F.Supp. at 1192–94; *Hartz,* 970 F.Supp. at 1422; *Doe,* 929 F.Supp. at 615; *but see Brzonkala,* 935 F.Supp. at 793.[15]

### 3. Reasonable Means to an End

Having determined that a rational basis exists for Congress' conclusion that gender-based violence substantially effects interstate commerce, the Court must next decide whether the GMVA is a reasonably adapted means to achieve Congress' end. *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360; *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964). Congress adopted the GMVA in part because of its assessment that the police, prosecutors and judges in the several states were not adequately protecting victims of domestic and other gender-motivated violence. *Seaton,* 971 F.Supp. at 1194. Congress "reviewed U.S. Justice Department statistics and studies of gender bias in state courts commissioned by seventeen state supreme courts" to reach this conclusion. *Doe,* 929 F.Supp. at 611. This review led Congress to conclude that "bias and discrimination in the criminal justice system often deprives victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled." H.R. Conf. Rep. No. 103–711, at 385 (1994), *reprinted at* 1994 U.S.C.C.A.N. 1839, 1853; *see also* Rep. No. 103–138, at 49 (1993) ("Traditional State law sources of protection have proved to be difficult avenues of redress for some of the most serious crimes against women.").[16] Whether Congress was right or wrong in this conclusion about the proffered inadequacies of state institutions, its decision to provide a private right of action in federal courts is certainly within its prerogative; i.e., it is a reasonable means to a legitimate end. *Anisimov,* 982 F.Supp. at 539–40; *Seaton,*

---

15. Even the *Brzonkala* court acknowledged that gender-motivated violence affects the national economy, but held that "[s]howing that something affects the national economy does not suffice to show that it has a *substantial effect* on interstate commerce." *Brzonkala,* 935 F.Supp. at 792. *Brzonkala* cites no support for this distinction and this Court respectfully suggests it is mistaken. The appropriate inquiry focuses on *the extent of the regulated activity's impact.* If that effect is substantial, then Congress is within its power to regulate the activity, even if the activity affects the "national economy" as opposed to interstate commerce. *See New York v. United States,* 505 U.S. 144, 158, 112 S.Ct. 2408, 2418–19, 120 L.Ed.2d 120 (1992) (activities that affect national economy are within Congress' power to regulate). *Brzonkala* posits that such a rule would give Congress plenary power to regulate everything, including insomnia, because all activities ultimately affect the national economy. *Brzonkala,* 935 F.Supp. at 792–93 (discussing annual costs of insomnia). Congress may indeed have the power to regulate activities relating to insomnia if a rational basis existed to conclude that such activities have a substantial effect on the national economy and interstate commerce. *Brzonkala's* parade of horribles cannot pass for constitutional analysis, which requires an assessment of the extent of the activity's impact. As noted above, it seems clear that a rational basis exists for Congress' conclusions in this regard. *See also Seaton,* 971 F.Supp. at 1193 (discussing *Brzonkala's* distinction between national economy and interstate commerce).

16. The concern that traditional remedies are inadequate is applicable to federal court as well. *Cf. Eagleston v. Guido,* 41 F.3d 865 (2d Cir.1994) (affirming directed verdict for county in § 1943 action alleging equal protection violation based on county's policy regarding arrests in domestic violence cases), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995).

971 F.Supp. at 1194–95; *Hartz,* 970 F.Supp. at 1423; *Doe,* 929 F.Supp. at 616–17.

Finally, the Court notes that unlike the law ·at issue in *Lopez,* which the Supreme Court characterized as a "sharp break with the long-standing pattern of federal ... legislation," *Lopez,* 514 U.S. at 563, 115 S.Ct. at 1632 (quoting *United States v. Lopez,* 2 F.3d 1342, 1366 (5th Cir.1993)), the GMVA fits squarely within the tradition of federal civil rights legislation. Indeed, following the expansion of Congress' Commerce Clause power during the great depression, *see supra* at 393–94, the next great "constitutional moment" [17] in Commerce Clause jurisprudence came with the Civil Rights Movement in the 1960's. The Supreme Court upheld civil rights legislation then (and thereafter) under Congress' Commerce Clause power. See *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). There is no reason to depart from that tradition now.

## CONCLUSION

For the reasons discussed above, defendants' motion is GRANTED with respect to plaintiff's (i) Jury Duty Act claim, (ii) Title VII claim against the individual defendants, (iii) and Section 1983 claim against NYCHA, and DENIED in all other respects. The case remains on the Court's December 1997 trailing trial calendar.

**SO ORDERED.**

---

**17.** The phrase is Bruce Ackerman's. See Bruce Ackerman, *We the People: Foundations (1991).*