Jane DOE

v.

**Ronald MERCER, Michael Irvin, and Chauncey Billups.**

**No. Civ.A. 98–10649–RGS.**

United States District Court, D. Massachusetts.

Feb. 19, 1999.

Margaret A. Burnham, Carolyn Clark, Burnham, Hines & Dilday, Boston, MA, Charles Ogletree, Cambridge, MA, for Jane Doe.

Marcia K. Sowles, U.S. Dept. of Justice, Civil Div., Washington, DC, David S. Mackey, U.S. Attorney's Office, Boston, MA, for U.S.

Dennis J. Kelly, Anthony J. Fitzpatrick, Burns & Levinson, Boston, MA, for Ronald Mercer, Chauncey Billups.

Willie J. Davis, Davis, Robinson & White, Boston, MA, Dennis J. Kelly, Anthony J. Fitzpatrick, Burns & Levinson, Boston, MA, for Michael Ervin.

Nicholas C. Theodorou, David A. Anderson, Foley, Hoag & Eliot, Boston, MA, Dennis J. Kelly, Anthony J. Fitzpatrick, Burns & Levinson, Boston, MA, for Antoine Walker.

Alice E. Richmond, Richmond, Pauly & Ault, Boston, MA, Julie Goldschield, NOW Legal Defense Fund, New York City, for Legal Defense and Educ. Fund.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

STEARNS, District Judge.

On April 4, 1998, Jane Doe, a pseudonymous plaintiff, brought this Complaint against defendants Ronald Mercer, Michael Irvin, and Chauncey Billups.[1]  Doe claims that the three men raped her.[2]  She seeks civil damages from the defendants under the Violence Against Women Act (VAWA), 42 U.S.C. § 13981.  Before the court is defendants' motion to dismiss. Defendants argue that the VAWA is facially unconstitutional.[3]

The VAWA declares that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender."  42 U.S.C. § 13981(b).  Section 13981(c) of the VAWA authorizes persons who have been victimized by gender violence to bring a civil claim in the federal courts.

([A]) person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

The term "crime of violence" is defined as:

an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States.

42 U.S.C. § 13981(d)(2)(A).

The VAWA was passed "[p]ursuant to the affirmative power of Congress to enact this part under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I [the Commerce Clause] of the Constitution."  42 U.S.C. § 13981(a).  The VAWA's self-stated purpose is "to protect the civil rights of victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce by establishing a Federal civil rights cause of action for victims of crimes of violence motivated by gender."  Id.

Under the Commerce Clause, Article I, § 8, cl. 3, Congress may regulate three broad categories of commercial activity.

First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of

---

1.  Doe also sued a fourth defendant for negligence, claiming that he had failed to protect her from the assault.  The claim has since been dismissed.

2.  Doe also alleges pendent state law claims of assault and battery and intentional infliction of emotional distress against each defendant.

3.  On May 18, 1998, Mercer filed this motion to dismiss.  Billups and Irvin thereafter joined the motion.  On July 8, 1998, the United States intervened as a matter of right to defend the constitutionality of the VAWA. The NOW Legal Defense and Education Fund and ten other organizations filed a joint brief amici curiae.

interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*United States v. Lopez,* 514 U.S. 549, 558–559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (citations omitted).

The parties agree that Congress, in passing the VAWA, relied on the last of its three regulatory powers. Defendants argue, however, that the VAWA has "nothing to do" with commerce, but is rather an illegal federal encroachment on the sovereign prerogative of the States to regulate the punishment of crimes of violence. Defendants rely on *Brzonkala v. Virginia Polytechnic and State University,* 935 F.Supp. 779 (W.D.Va.1996), a district court opinion declaring the VAWA unconstitutional. The *Brzonkala* decision depended primarily on *United States v. Lopez,* supra, a 1995 Supreme Court case striking down the "Gun Free School Zones Act," 18 U.S.C. § 922(q), as an unsupportable exercise of Congress's power under the Commerce Clause.[4] In *Brzonkala,* Chief Judge Kiser determined that the similarities between the VAWA and the Gun Free School Zones Act outweighed any significant differences of constitutional implication. Specifically, Judge Kiser found that the VAWA, like the guns and schools statute: (1) purported to regulate intrastate activity of a non-commercial nature; (2) contained no jurisdictional element tying individual cases to interstate commerce;

and (3) inappropriately extended Congress's power into an area of domestic law historically reserved to the States. Moreover, in Judge Kiser's view, the "findings" on which Congress based its exercise of the commerce power assume that any activity of a non-commercial nature that can be shown to ultimately impact on the national economy has a constitutional effect on interstate commerce. "If such a chain of causation sufficed, Congress's power would extend to an unbounded extreme." *Brzonkala,* 935 F.Supp. at 792–793.

Despite these objections, every other district court that has entertained a similar challenge to the VAWA has found the Act constitutional.[5] See *Liu v. Striuli,* 36 F.Supp.2d 452 (D.R.I.1999); *Mattison v. Click Corp. of America, Inc.,* 1998 WL 32597 (E.D.Pa. Jan. 27, 1998); *Timm v. Delong,* No. 8:98CV43 (D.Neb. June 22, 1998); *Ziegler v. Ziegler,* 28 F.Supp.2d 601 (E.D.Wash.1998); *C.R.K. v. Martin,* No. 96–1431–MLB (D.Kan. July 10, 1998); *Doe v. Hartz,* 970 F.Supp. 1375 (N.D.Iowa 1997), *rev'd on other grounds,* 134 F.3d 1339; *Anisimov v. Lake,* 982 F.Supp. 531 (N.D.Ill.1997); *Seaton v. Seaton,* 971 F.Supp. 1188 (E.D.Tenn.1997); *Crisonino v. New York City Housing Authority,* 985 F.Supp. 385 (S.D.N.Y.1997); *Doe v. Doe,* 929 F.Supp. 608 (D.Conn.1996).

In distinguishing *Lopez,* the district courts supportive of the VAWA have made essentially the same point. The *Crisonino* case is a representative example.

> The record in support of Congress' authority to enact the GMVA[6] could not be more different ... than that facing the *Lopez* Court. Congress conducted four years of hearing and study before

---

4. I use the past tense in referring to *Brzonkala* as Judge Kiser's holding was overturned on December 23, 1997, by a divided panel of the Fourth Circuit Court of Appeals. 132 F.3d 949. The panel's decision was then withdrawn (on February 5,1998), after the en banc Court voted to rehear the case. As of this date, no decision has issued from the en banc Court.

5. Judge Kiser also held that Congress lacked the authority to enact the VAWA under the Enforcement Clause (§ 5) of the Fourteenth Amendment. One of the cases listed above, *Timm v. Delong,* holds that Congress acted within its powers under § 5.

6. The *Crisonino* decision and several others refer to the VAWA as the "Gender Motivated Violence Act (GMVA)."

enacting the GMVA, *Anisimov,* 982 F.Supp. at 536–37; *Seaton,* 971 F.Supp. at 1192; *Hartz,* 970 F.Supp. at 1421; *Doe,* 929 F.Supp. at 611, and made voluminous legislative findings regarding the impact domestic and other gender-motivated violence has on the national economy and interstate commerce. Congress heard testimony from "law enforcement officials, anti-domestic violence organizations, rape crisis centers, psychiatrists, other mental health experts, physicians, law professors, ... state Attorneys General, and victims of domestic violence." *Doe,* 929 F.Supp. at 611. Some of the more compelling testimony and Congressional findings include:

> Domestic violence costs employers between $3 to $5 billion annually as a result of absenteeism. 139 Cong.Rec. H10349–01, at H10365 (Nov. 20, 1997) (statement of Sally Goldfarb, NOW Legal Defense and Education Fund). "Gender-based violence bars its most likely targets—women—from full [participation] in the national economy." S.Rep. No. 103–138 at 54 (1993). The nation spends $5 to $10 billion a year on health care, criminal justice and other costs related to domestic violence. Id. at 41.

> "[A]lmost 50 percent of rape victims lose their jobs or are forced to quit in the aftermath of the crime." Id. at 54.

> "As many as 50 percent of homeless women and children are fleeing domestic violence." S.Rep. No. 101–545, at 37 (1990).

> Homicide is the leading cause of death for women in the workplace. S.Rep. No. 103–138, at 54 n. 70.

> "[F]ear of gender-based violence ... deters women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence." Id. at 54.

Following four years of hearings, Congress concluded that "[g]ender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending all of which affect interstate commerce and the national economy." S.Rep. No. 103–138, at 54 (1993). See also H.R.Conf.Rep. 103–711, at 385 (1994) ("crimes of violence motivated by gender have a substantial effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce"), *reprinted at* 1994 U.S.C.C.A.N. 1839, 1853.

"Clearly, just because Congress says that an activity affects interstate commerce does not make it so." *Seaton,* 971 F.Supp. at 1193; see also *Doe,* 929 F.Supp. at 614 ("whether a particular activity substantially affects interstate commerce is 'ultimately a judicial rather than a legislative question' ") (quoting *Lopez,* 514 U.S. at 557 n. 2, 115 S.Ct. 1624). The question of whether a regulated activity substantially affects interstate commerce "is necessarily one of degree." *Lopez,* 514 U.S. at 566, 115 S.Ct. 1624. In light of the extensive legislative findings regarding the effect of gender-motivated violence, I find a rational basis for the conclusion by Congress that gender-motivated violence substantially affects interstate commerce.

*Crisonino,* 985 F.Supp. at 395–396.

Whether reliance on legislative findings is sufficient to save the VAWA from the fate of the Gun Free School Zones Act largely depends on whether *Lopez* is interpreted to mean that Congress had trespassed the boundaries of the Commerce Clause or whether it had simply failed to offer a sufficiently compelling justification for deciding to "displac[e] state policy choices." 514 U.S. at 561 n. 3, 115 S.Ct. 1624. Courts adopting the latter interpretation have seized on Chief Justice Rehn-

quist's emphasis on the lack of legislative findings linking guns, schools and commerce, and the government's resort to the piling of "inference upon inference" about the possible impact the exposure of schoolchildren to gun violence might have on the national economy.

> The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce.... Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign.

*Lopez,* 514 U.S. at 564, 115 S.Ct. 1624.

At the same time, Chief Justice Rehnquist acknowledged that explicit findings of Congress play an important role in determining whether a legislative act is constitutionally valid.

> Although as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce, ... the Government concedes that "[n]either the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." ... We agree with the Government that Congress normally is not required to make formal findings as to the

substantial burdens that an activity has on interstate commerce.... But to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.

Id., at 562–563, 115 S.Ct. 1624.

While I do not pretend that the matter is without doubt, I join the overwhelming majority of district courts that have found the VAWA constitutional. I do so for four reasons. First, while legislative findings are not conclusive, they are, under the extremely deferential test used to evaluate the exercise of Congress's power under the Commerce Clause, deserving of the utmost respect. See *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258–259, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) ("The only questions are: (1) whether Congress had a rational basis for finding that racial discrimination by motels affected commerce, and (2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appropriate").[7] While one can trivialize the importance of the specific findings that Congress made in passing the VAWA, as Judge Kiser did in citing the drain on the national economy caused by insomnia, 935 F.Supp. at 793, the analogy is not apt. A lost night of sleep is not readily equated with the physical and psychological harms of a rape or an incident of domestic violence, even if in some quantitative fashion the dollar loss to the economy is the same. It is true, as Judge Kiser argues, that "[i]f the justification for the VAWA under the Commerce Clause is constitutionally acceptable, then certainly Congress would have the power to regulate much activity which should be left to state control." 935 F.Supp. at 793. But this is received truth. The Commerce

---

7. The *Lopez* Court made clear that it was not departing from a half-century of precedent limiting constitutional scrutiny under the Commerce Clause to the issue of whether

Congress had a rational basis for concluding that the activity regulated substantially affected interstate commerce. 514 U.S. at 557, 115 S.Ct. 1624.

Clause permits Congress to regulate the national economy to its very bottom, a power confirmed during the constitutional struggle over President Franklin Roosevelt's New Deal. See *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, (1937). To say that Congress has such power, however, is not to say that Congress will inevitably exploit it to its fullest extent, or that courts will always defer to Congress. There are political and practical, as well as constitutional limits on the ability (and will) of Congress to aggrandize federal power at the expense of the States.

The second argument made against the VAWA is that it injects the federal government into an area of domestic law enforcement historically regarded as the primary, if not the exclusive, responsibility of the States. While at first blush this might seem true, on closer analysis the argument is something of a red herring. The VAWA does not encroach on the police powers of the States or intrude in the execution of state criminal laws. The VAWA in fact authorizes the federal government to do nothing. It merely provides a civil remedy in the federal courts to victims of gender violence who, for whatever reason, cannot obtain or have declined to seek redress in the courts of their states.[8] Congress has not usurped the power of the States to provide parallel civil remedies.[9] What Congress has done is give victims of gender violence the same right of private redress in the federal courts that victims of employment discrimination and civil rights violations already enjoy.

Third, while it is true that the VAWA does not directly regulate conduct that is commercial in nature, there is no require-ment under the Constitution that this be so. As Chief Judge Posner has observed, the fact that a law is not intended "to increase the gross national product by removing a barrier to free trade, but rather to protect personal safety and property rights, is irrelevant.... Congress can regulate interstate commerce for any lawful motive." *United States v. Soderna*, 82 F.3d 1370, 1374 (7th Cir.1996) (rejecting a Commerce Clause challenge to the Freedom of Access to Clinic Entrances Act). The true test, as *Lopez* makes clear, is not whether the regulated activity is itself commercial, but whether by its individual or cumulative nature "it exerts a substantial effect on interstate commerce." *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942), quoted in *Lopez*, 514 U.S. at 556, 115 S.Ct. 1624. Thus courts have deflected *Lopez*-based challenges to Congressional enactments as remote from the market as the Eagle Protection Act. See *United States v. Bramble*, 103 F.3d 1475, 1481 (9th Cir.1996) ("Extinction of the eagle would substantially affect interstate commerce by foreclosing any possibility of several types of commercial activity; future commerce in eagles or their parts; future interstate travel for the purpose of observing or studying eagles; or future commerce in beneficial products derived either from eagles or from analysis of their genetic material.")

The final point, that the VAWA has no jurisdictional restriction, while accurate, is not compelling. A jurisdictional element is one way in which Congress can link a statute to interstate commerce (by requiring, for example, proof that a handgun circulated in interstate commerce before finding its way into the hands of a felon).

---

**8.** One of the specific findings made by Congress in passing the VAWA involved the obstacles that female victims of gender-motivated violence face in obtaining relief in state courts: "Traditional State law sources of protection have proved to be difficult avenues of redress for some of the most serious crimes against women. Study after study has concluded that crimes disproportionately affecting women are often treated less seriously than crimes affecting men. [C]ollectively, these reports provide overwhelming evidence that gender bias permeates the court system and that women are most often its victims." S.Rep. No. 103–138, at 49 (footnotes omitted).

**9.** Rape, for example, is actionable as a civil assault and battery in every State.

But it is not the only way. *Lopez* reaffirms the principle that through specific findings of fact, Congress can demonstrate a rational basis for its conclusion that a regulated activity has a substantial impact on interstate commerce. This is the approach that Congress chose to follow in enacting the VAWA.[10] Its decision to do so will be second-guessed by a court only for "the most compelling constitutional reasons." *Mistretta v. United States*, 488 U.S. 361, 384, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

### ORDER

For the foregoing reasons, the defendants' motion to dismiss is *DENIED*.

---

**10.** That it chose this path is not surprising given the conceptual difficulty of formulating a jurisdictional element that would encompass the underlying state crimes that the VAWA is intended to reach.